Argued and submitted September 5, 1990, convictions affirmed; sentence of death vacated and remanded to the circuit court with instructions February 7, 1991

## STATE OF OREGON,
*Respondent,*

v.

## DALLAS RAY STEVENS,
*Appellant.*

## (CC CM88020368; SC S35888)

806 P2d 92

Phil Studenberg, Klamath Falls, argued the cause for appellant. With him on appellant's brief was Myron Gitnes, Klamath Falls.

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause for respondent. With her on respondent's brief were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, and Cynthia A. Carter and Brenda J Peterson, Assistant Attorneys General.

GRABER, J.

## GRABER, J.

Defendant was convicted of three counts of aggravated murder and sentenced to death.[1] His convictions and sentence are before us on automatic and direct review. ORS 163.150(1)(f) (1987). Defendant also was convicted of, and sentenced for, several noncapital felonies, which he appealed to the Court of Appeals. The Court of Appeals certified that appeal to this court. We accepted the certification, ORS 19.210, and consolidated all issues for review.[2]

Defendant asks us to reverse his convictions on all charges or, in the alternative on the aggravated murder counts, to vacate his sentence of death. We affirm his convictions of aggravated murder, vacate the sentence of death, and remand to the circuit court for a new penalty phase proceeding. We also affirm his convictions of kidnapping, rape, sexual abuse, and assault and remand to the circuit court to modify the sentences on three of the counts.

Because the jury found defendant guilty, we view the evidence in the light most favorable to the state. *State v. Brown*, 310 Or 347, 350, 800 P2d 259 (1990). On February 26, 1988, at about 3:30 p.m., defendant arrived at a friend's house in Creswell. Ms. Edwards was there with her four daughters, ages eight, five, four, and two. Edwards and defendant had known each other for 10 years; defendant was married to Edwards' estranged husband's sister.

Defendant gave Edwards a ride to the store to get a part for her car, which was running poorly. According to defendant, he agreed to give Edwards a ride in return for her help in locating drugs for him. Defendant testified that they stopped at a friend's house, where he injected methamphetamine and smoked a small amount of marijuana. Edwards denied that she was involved in looking for drugs and denied that they stopped en route. Edwards then retrieved her car from Creswell and asked defendant to follow

---

[1] Although defendant was convicted of killing only one person, the jury convicted him on three different theories of aggravated felony murder, ORS 163.095(2)(d), each based on a different underlying felony.

[2] Assignments of Error Nos. 6, 8, and 9 relate only to aggravated murder. Assignment of Error No. 7 relates only to the noncapital felonies. All other assignments of error relate to all the convictions.

her home in case she had car trouble. The eight-year-old and the five-year-old asked to ride with defendant, whom they knew, and the four-year-old joined her sisters. The youngest girl rode with her mother.

On the way home, Edwards stopped at a store for cigarettes. She testified that defendant, who was following her, appeared to stop or, at least, to slow down. When Edwards emerged from the store, however, defendant and the three girls were gone. She drove home and waited for defendant. When he did not arrive, she drove back along roads that she thought he might have taken, looking for his car. At 3 a.m., she called the police.

Lane County Deputy Sheriff House met Edwards at about 3:30 a.m. on February 27 at a gas station in Creswell. According to House, Edwards was extremely upset. Edwards said that she had not given defendant permission to take the girls and did not know where defendant lived.

A search for the missing girls followed. The eight-year-old and the four-year-old were found in defendant's house, at a dairy farm, shortly after 7 a.m. They reported physical and sexual abuse, which their condition confirmed; both girls were naked, and the younger of the two had bruises around her eyes. The older girl told the police that defendant had taken their clothes away.

The police located defendant elsewhere on the farm at 8:18 a.m. and, after they convinced him to drop a knife that he was holding, arrested him at 8:25 a.m. An officer advised defendant of his *Miranda* rights; he said that he understood them. When questioned about the missing five-year-old, defendant told inconsistent stories.

The search for the five-year-old resumed, throughout the farm. At 9:26 a.m., two officers went back into defendant's house. They found the girl's body in the attic at 9:30 a.m. After verifying that the girl was dead, the officers left the house. No one entered it again until after defendant gave his consent to a search, shortly after noon.

Defendant at first denied that he had done anything to the girls. After being confronted with the surviving girls' accusations and the discovery of the five-year-old's body, he admitted that he had killed the five-year-old by strangling her

with a sock and stabbing her twice. He also said that he had used methamphetamine the night before and that he "was fuzzed up like crazy."

At trial, Dr. Buchanan, the doctor who treated the eight-year-old and the four-year-old at the hospital emergency room on the morning of February 27, 1988, was called as a witness. She testified that her examination revealed evidence of assault and sexual abuse that matched the older child's descriptions. She also found physical evidence that supported what the younger child said about abuse by defendant.

At the conclusion of the guilt phase of defendant's trial, he was convicted of all the crimes charged in the indictment: three counts of aggravated murder; four counts of first-degree kidnapping; two counts of first-degree sexual abuse; one count of first-degree rape; and two counts of second-degree assault. With respect to the aggravated murder convictions, the jury answered "yes" to the three statutory questions, ORS 163.150(1)(b) (1987), and defendant received a sentence of death. He also was sentenced to three 30-year prison terms, two 10-year terms, and one 5-year term on the noncapital felonies.

## ASSIGNMENT OF ERROR NO. 1

■ In his first assignment of error, defendant argues that the trial court erred in denying his motion to allow him to ask questions of prospective jurors. Before *voir dire,* defense counsel filed a motion to permit defendant personally "to participate to a limited degree in the *voir dire* examination [by] ask[ing] a limited number of questions of each juror." Counsel asserted in argument that defendant wanted the opportunity to ask prospective jurors questions in order to "evaluate their responses" to him, such as willingness to have eye contact. Defense counsel also stated that "the jurors ought to have an opportunity to at least have some words with the man whose fate and possible life or death that they are going to be determining." The court denied the motion, concluding that defendant did not have a concurrent right, along with his counsel, to question jurors, and that it had discretion to allow or deny the motion.

Defendant first contends that Article I, section 11, of the Oregon Constitution guarantees him the right to perform

the same functions as counsel. The key portion of that provision declares that, "[i]n all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel." Defendant argues that the use of the conjunctive "and" means that he, as well as his counsel, has the right to question prospective jurors.

The state responds, and we agree, that Article I, section 11, grants two distinct, not overlapping, rights: the defendant's right to make a statement and to testify, and the defendant's right to be represented by counsel. In his concurrence in *State v. Douglas,* 292 Or 516, 527-38, 641 P2d 561 (1982), Justice Lent provided an exhaustive history of the evolution of the right to be heard. He concluded that it was a defendant's right to make a statement that early Americans, including the drafters of the Oregon Constitution, had in mind when they declared that the defendant has a right to be heard "by himself." 292 Or at 532. As a separate matter, constitutional provisions ensuring a defendant's right to be heard "by counsel" reflected colonial repudiation of the common-law rule that accused felons could not be represented by counsel. *Faretta v. California,* 422 US 806, 827, 95 S Ct 2525, 45 L Ed 2d 562 (1975).

Provisions identical or similar to Article I, section 11, are common in state constitutions. *Faretta v. California, supra,* 422 US at 813 n 10. State courts interpreting those provisions consistently have rejected the argument that a criminal defendant has a constitutional right to perform the same functions as his or her counsel (sometimes called "hybrid representation"). *See, e.g., State v. Gethers,* 197 Conn 369, 497 A2d 408 (1985) (interpreting an identical provision in the Connecticut Constitution, the court cites many cases from other states with similar provisions that rejected the right to hybrid representation and the reading of "and" that defendant here advances); 2 W. LaFave & J. Israel, Criminal Procedure 51, § 11.5(f) (1984) (collecting federal and state cases).

■■ In the alternative, defendant argues that the trial court abused its discretion in refusing to allow him to act as co-counsel during *voir dire.* Although a defendant has no constitutional right to hybrid representation, we agree with other courts' holdings (including those of the Oregon Court of Appeals) that trial courts have discretion to allow, as well as

to deny, hybrid representation. Examples are *State v. Reynolds,* 43 Or App 619, 625-26, 603 P2d 1223 (1979), *aff'd on other grounds,* 289 Or 533, 614 P2d 1158 (1980); *State v. Easton,* 35 Or App 603, 606, 582 P2d 37, *rev den* 284 Or 521 (1978); *State v. Whitlow,* 13 Or App 607, 611, 510 P2d 1354 (1973); *Bradberry v. State,* 266 Ind 530, 534, 364 NE2d 1183, 1187 (1977). Nonetheless, in this case, no abuse of discretion has been shown.

■ Defendant also contends that the denial of his motion violated Article I, section 20, of the Oregon Constitution, which states: "No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." Defendant argues that, because the defendant in "Oregon's only case under current pertinent law," *State v. Wagner,* 305 Or 115, 752 P2d 1136 (1988), *judgment vacated and remanded on other grounds,* 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989), was allowed to represent himself, defendant should have been allowed to participate in *voir dire.*

The essence of defendant's argument is that one judge's exercise of discretion in an earlier, unrelated case precludes any different exercise of discretion by a different judge in his case. That kind of contention, without more, does not establish a violation of Article I, section 20, because "[a] complaint of unequal treatment * * * cannot rest simply on the existence of discretion alone." *State v. Freeland,* 295 Or 367, 371, 667 P2d 509 (1983). Defendant does not suggest anything more, for instance, that he was the victim of discrimination. The trial court did not err in denying defendant's motion.

## ASSIGNMENT OF ERROR NO. 2

Defendant next asserts that the trial court erred in denying his motion to suppress all evidence found in the warrantless searches of his house.[3] As previously discussed,

___

[3] Specifically, he sought to suppress any evidence relating to, and any statements from, the two surviving girls, and any testimony from other witnesses about their statements; any photographs, laboratory reports, autopsy reports, or related testimony regarding the dead girl's body; all evidence seized from defendant's house at the dairy farm, either before or after his consent to search; his own statements; and "all information or knowledge gained either directly or indirectly" from the searches. Because we uphold the validity of all three searches of defendant's house, we need not differentiate which evidence resulted from which search.

during the morning of February 27, 1988, the police searched defendant's house twice: once when they found the eight-year-old and the four-year-old alive, and a second time when they found the five-year-old's body. The trial court denied the motion on the ground that the warrantless searches were justified by probable cause and exigent circumstances.

■ Both the Oregon and United States constitutions prohibit unreasonable searches and seizures.[4] In order to search a home without a warrant for evidence of crime, the police must act within one of the established exceptions to the warrant requirement. *State v. Davis,* 295 Or 227, 237, 666 P2d 802 (1983). The state bears the burden of proving that an exception to the warrant requirement existed. *Ibid.*

■ In this case, the state argues, and trial court held, that the warrantless searches were justified, because the police were presented with both probable cause to believe that a crime had occurred and an exigent circumstance. *State v. Bridewell,* 306 Or 231, 235-36, 759 P2d 1054 (1988). An exigent circumstance is a situation that requires the police to act swiftly to prevent danger to life or serious damage to property, or to forestall a suspect's escape or the destruction of evidence. *State v. Girard,* 276 Or 511, 514 n 2, 555 P2d 445 (1976). The first of those circumstances — imminent danger to life — is called into play here.

■ In evaluating whether the warrantless searches were justified, we are bound by the trial court's findings of historical fact if evidence supports them.[5] Our function is to decide whether the trial court applied legal principles correctly to those facts. *State v. Peller,* 287 Or 255, 260, 598 P2d 684 (1979). In

---

[4] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[5] Defendant does not dispute the trial court's findings. Instead, he argues that the situation did not justify either of the warrantless searches.

addition, if the trial court did not make findings on all pertinent historical facts and there is evidence from which those facts could be decided more than one way, we will presume that the trial court found facts in a manner consistent with its ultimate conclusion. *Ball v. Gladden,* 250 Or 485, 487, 443 P2d 621 (1968). Because the sequence of events is crucial, in this case, to decide whether the circumstances satisfied an exception to the warrant requirement, we will set out facts from the record in some detail. Our narrative includes both facts that the trial court found expressly and additional pertinent facts that are consistent with the trial court's conclusion.

## *The First Search*

At about 4:30 a.m. on February 27, 1988, the dispatch supervisor at the Linn County sheriff's office received a call from an employee of the Lane County sheriff's office, asking for a "welfare check" on the three missing Edwards girls at a dairy farm where defendant worked. Linn County Officer Greene had difficulty locating the property and called Deputy Freeman to help him. It took the two officers over an hour to find the dairy farm. In the meantime, they were told that the owner of the farm did not want them to disturb defendant while he was milking the cows.

At 5:42 a.m., the dispatcher informed the officers that the situation had become a Kidnap II investigation. At 5:47 a.m., the officers arrived at the dairy farm, which contained several buildings. They saw lights burning in the milking parlor, but no other lights or signs of activity. They saw a man looking at them from inside the parlor, over the milking tank, but did not enter the building.

The owner of the dairy farm, whom the dispatcher had asked to meet the officers there, arrived at about 6 a.m. The officers told him that they were now investigating a possible kidnapping and that they needed to speak with defendant. The owner, who had seen defendant milking earlier that morning, went into the milking parlor to look for him. After a few minutes, he emerged and said that defendant apparently had left. The owner then consented to a search of the dairy buildings and the grounds.

The officers searched the milking parlor and all of the major dairy buildings, until about 6:15 or 6:30 a.m. Because they could not locate defendant, they asked the owner where

defendant lived. The owner directed them to a house. After finding the house, the officers circled it and knocked on the doors and windows. No one responded. Then they noticed a car parked nearby. They called the dispatcher and confirmed that the car belonged to defendant and that it was the car that Edwards had seen him driving that night. When they approached, they noticed inside the car a small pink purse with cartoon characters on it and a child's white coat.

Until they found and identified the car and observed children's belongings in it, the officers had seen no evidence of the girls' presence, but now they became concerned that defendant had brought the girls to the dairy farm. The dispatcher informed Greene and Freeman that Lane County officers were on their way. Greene and Freeman quickly searched the dairy buildings that they had not yet explored. They did not locate defendant or the girls. Meanwhile, Greene asked the dispatcher to check defendant's criminal history. At 6:41, Greene received a report that defendant was an ex-convict who had been arrested in the past for a number of offenses, including second-degree rape, contributing to the sexual delinquency of a minor, burglary, robbery, and assaults.

Ten minutes later, two Lane County officers arrived. All the officers conferred and decided to enter defendant's house, to check on the safety of the girls. A few minutes after entering the residence, they found the eight-year-old and the four-year-old naked on a bed in the bedroom. Deputy House stayed with the two girls,[6] but no further search of the house was conducted at that time.

■ Defendant does not dispute that, at the time of the first entry, the police had probable cause to believe that he had kidnapped the girls. He does contend, however, that the police had "no reason to believe that the children were in the house, [because] there was no screaming or crying or any signs of life in the residence." We disagree. At the time of the first entry, the police had probable cause to believe that the girls were in the house. The girls had last been seen with defendant, who in turn had been seen at the dairy farm; the

---

[6] House, a female officer, stayed with the girls to calm them. They remained in the house, because defendant had taken the girls' clothing, and it was cold outside.

officers had searched all the dairy buildings without finding the girls; defendant apparently had fled alone; and the car, which was parked near the house, contained a little girl's purse and coat. We agree with the trial court's conclusion that the officers had probable cause to believe that the children could be found in defendant's residence.

■ Defendant also questions whether there was any exigency. First, we agree with the trial court's conclusion that the officers had probable cause to believe that the girls might be in danger. In addition to knowing the facts summarized in the preceding paragraph, the officers learned of defendant's history of violent offenses. In view of all the information that the police possessed, silence from within the house was ominous, rather than reassuring. *See State v. Miller,* 300 Or 203, 229-30, 709 P2d 225 (1985), *cert den* 475 US 1141 (1986) (police justified in making warrantless entry to render lifesaving assistance to victim and in seizing evidence, including victim's body).

Second, we agree with the trial court's conclusion that the circumstances justified immediate action. Defendant urges that the officers had time to secure a warrant and asks us to consider, in particular, the availability of a telephonic warrant, as provided in ORS 133.545(5) and ORS 133.555(3).[7] This court recognizes that one relevant factor in assessing whether an exigent circumstance exists is the

---

[7] ORS 133.545(5) provides:

"Instead of the written affidavit described in subsection (4) of this section, the judge may take an oral statement under oath when circumstances exist making it impracticable for a district attorney or police officer to obtain a warrant in person. The oral statement shall be recorded and transcribed. The transcribed statement shall be considered to be an affidavit for the purposes of this section. In such cases, the recording of the sworn oral statement and the transcribed statement shall be certified by the judge receiving it and shall be retained as a part of the record of proceedings for the issuance of the warrant."

ORS 133.555(3) provides:

"The judge may orally authorize a police officer or a district attorney to sign the judge's name on a duplicate original warrant. A duplicate original warrant shall be a search warrant for the purposes of ORS 133.535 to 133.615, and it shall be returned to the judge as provided in ORS 133.615. In such cases a judge shall enter on the face of the original warrant the exact time of the issuance of the warrant and shall sign and file the original warrant in the manner provided by law."

availability of a telephonic warrant. *State v. Wise,* 305 Or 78, 82 n 3, 749 P2d 1179 (1988).

In this case, however, defendant assumes incorrectly that the relevant period extended from 5:47 a.m., when the officers arrived at the dairy farm, to the time of the first entry about an hour and ten minutes later. The information that supplied the necessary elements did not come to the officers' attention at once. Until they saw the little girl's purse and coat in the car parked near the house and learned of defendant's criminal history, they did not have probable cause to believe both that the kidnapped children were in the house and that their lives were in danger. They acquired those essential pieces of information only a few minutes before the first entry.[8]

This is not a case in which the police unreasonably delayed the decision to search or waited for the passage of time predictably to create a foreseeable exigency. *Compare State v. Matsen/Wilson,* 287 Or 581, 601 P2d 784 (1979) (search held invalid). Investigation disclosed, rather than created, an exigency. When they set out to investigate the girls' disappearance, the officers were told only to look for them at the dairy farm where defendant worked. The farm covered a large area and contained many buildings; the children could have been anywhere. The officers conducted a reasonable investigation of the dairy buildings and grounds before focusing on defendant's house. They did not even know that it was his house until about half an hour before the first entry. Danger to the lives of the children was an exigency in the circumstances of this case.

■ Finally, defendant seems to suggest that, at least, the scope of the search was impermissible. Again, we disagree. The scope of the first warrantless search was properly limited to the exigency that justified it. *State v. Miller, supra,* 300 Or at 229. The officers searched only briefly and only for the missing children and, when they found two of the children, left to look for the third and for defendant. We hold that the

---

[8] The state presented evidence that there was insufficient time to obtain a telephonic warrant after the officers developed probable cause to believe, not only that defendant had kidnapped the girls, but also that the girls were in the house.

trial court did not err in refusing to suppress evidence that resulted from the first search of defendant's residence.

## The Second Search

When the officers found only two girls in the house, shortly after 7 a.m., they immediately became concerned about the third missing girl, the five-year-old. They questioned the eight-year-old about the whereabouts of the five-year-old. She told them that her sister had come with them to the house, but that defendant later told the eight-year-old that their father had taken the sister to his house. The eight-year-old also reported defendant's warning that, if they were not good, they would never see their mother again.

At that point, the officers believed that the missing child was with defendant, who was *not* in the house, or that he would tell them where she was. At 7:16 a.m., they called for a canine unit, which they thought would be the fastest way to locate defendant and the child in a rural area. The canine unit arrived at 7:51 a.m. The officers then resumed their search for defendant and the missing child.

At 8:18 a.m., the police found defendant standing by a creek and holding a knife. He was dressed only in jeans and socks and was soaking wet. The officers ordered him to drop the knife, which he did after a few minutes. The officers arrested defendant at 8:25 a.m. They had some difficulty getting him into a police car, but did so a little before 9 a.m.

By that time, House had relayed additional information that she had learned from the two girls in the house. Among other things, the girls said that they had been sexually assaulted and that defendant had choked the four-year-old with a chain. Also by a little before 9 a.m., Detective Salsbery had arrived and had been placed in charge of the investigation. He questioned defendant about the missing girl's whereabouts. Defendant told inconsistent stories. When that occurred, Salsbery told all officers present to search immediately for the missing child. They set out to scour the entire area. At 9:26 a.m., Freeman and another officer entered defendant's house. At 9:30 a.m., Freeman discovered the five-year-old's body in a plastic bag in the attic crawl space. He ripped open the bag to check for signs of life. When he could find none, the officers left the house immediately.

Defendant relies on the same arguments to attack the second search as he did to attack the first. He asserts that the police lacked probable cause to believe that the missing girl was in the house or that she was in danger, and that the situation did not justify immediate action. Our conclusions, like the trial court's, are to the contrary. When the officers learned that the five-year-old had been in the house with the other two girls, that defendant had physically and sexually abused the girls, that the missing girl was not with defendant when he was found holding a knife, and that defendant's statements were evasive and inconsistent, they had the requisite probable cause to search the house for the missing girl or for evidence of her whereabouts and had the need for swift action. They did not have all the pieces of the puzzle until about 9 a.m., just before they began the search. Once they acquired enough information to give them probable cause, any loss of time could have been critical, because the missing child might still have been alive. The police were actively looking for her everywhere on the premises, beginning at about 9 a.m., and they were not required to suspend their search to obtain a warrant, even though they did not find the child's body until about 9:30 a.m.

The second search, like the first, was properly limited to the exigency that created it. The search of defendant's residence lasted only a few minutes. The officers looked only for the child, and they left as soon as they determined that she was dead. We hold that the trial court did not err in refusing to suppress evidence that resulted from the second search of defendant's residence.

## ASSIGNMENTS OF ERROR NOS. 3 AND 4

Defendant assigns error to two rulings of the trial court: that defendant's consent to search his house on the afternoon of February 27, 1988 (the third search), was voluntary and that his statements to the police on February 27 and 28, 1988, were voluntary.[9] Because the two assignments of

---

[9] Both the Oregon and federal constitutions guarantee that no person shall be compelled in any criminal prosecution to testify against himself. Or Const, Art I, § 12; US Const, Amend V. The privilege against self-incrimination under both constitutions guarantees that testimony procured by any threat or promise, direct or implied, will not be used against an accused. *State v. Smith,* 301 Or 681, 694, 725 P2d 894 (1986); *Bram v. United States,* 168 US 532, 542-43, 18 S Ct 183, 42 L Ed 568 (1897).

error are predicated on similar facts and require similar legal analysis, we consider them together.

The police arrested defendant at 8:25 a.m. on February 27, 1988. At the time, he was wearing only jeans and socks and was soaking wet. He was slow to respond to commands, could not stand without help, and had difficulty walking. After defendant was handcuffed and put in Deputy Thompson's patrol car, Thompson advised defendant of his *Miranda* rights. Thompson testified that defendant said that he understood his rights.

At 8:55 a.m., defendant was moved from Thompson's car to Detective Salsbery's car. Defendant was still wet and cold, but he walked to the car himself. Salsbery turned up the heater to help warm defendant. Because defendant had just been advised of his rights, Salsbery did not repeat the advice. Salsbery testified that defendant's speech was somewhat slurred and that, at times, he was incoherent and evasive, but that his responsiveness and alertness improved as he became warmer. The sole topic of discussion was the whereabouts of the missing girl, about which defendant told inconsistent stories.

Salsbery then drove to the county jail, arriving at about 9:50 a.m. Defendant was able to walk into the building himself, was more alert and responsive, and remarked that he was getting warmer. Once inside, he received dry clothes, coffee, and cigarettes. Defendant was again advised of his *Miranda* rights. Detective Welch, who was present, testified that defendant said that he understood each right. Defendant said that he was willing to talk to Salsbery and Welch. He gave a taped interview from 10:10 a.m. until 12:42 p.m.

Salsbery, who had experience as a narcotics officer, testified that defendant did not appear to be under the influence of any drug during the interview. Welch testified that defendant was alert and responsive. During the interview, defendant at first denied having abused the two surviving girls or having had the murdered girl with him. Later, he admitted that he had abused the eldest child and had killed the five-year-old. Defendant told the detectives that he had injected methamphetamine at 8 p.m., 10 p.m., and midnight on February 26. At trial, he testified that he had injected his

remaining "scraps" of methamphetamine on the morning of February 27, at about 3 a.m.

Defendant gave the detectives many details of the murder. He also told them that he had burned the girls' clothes. He drew a diagram of the dairy, accurately showing the location of his drugs, the girl's body, and the knife that he had used to stab her. Defendant said that he knew he would be prosecuted. He expressed concern about the effect of his crimes on his family.

Defendant consented to the third search of his house but, before doing so, asked the detectives whether they had a warrant and whether they needed one. Salsbery told defendant that the police did not have a search warrant and that he always asked first for permission to search. He told defendant that he did not have to consent to a search but that, if he did, any evidence discovered could be used against him. Defendant said that he understood. He then consented orally to the search for evidence of the crimes for which he had been arrested and signed a consent form.

Toward the end of the interview, defendant affirmed that he had made his statements "knowingly, voluntarily, and intelligently." He attributed his earlier difficulty in walking to "hypothermia setting in."

At 2:25 p.m., defendant gave a urine sample. It tested positive for methamphetamine. The criminologist who tested the urine testified that the best indicator of possible impairment due to methamphetamine use was personal observation.

The next afternoon, February 28, defendant gave another taped statement. The interview lasted from 1:40 p.m. to 2:09 p.m. Defendant added little to the information that he had given the day before. As on February 27, sometimes he was responsive and clear, while at other times he was rambling and difficult to follow. The detectives ended the interview as soon as defendant said that he did not want to talk anymore.

At the hearing on his motion to suppress, defendant called as a witness Dr. Maletsky, a psychiatrist who had read transcripts of the taped interviews. Maletsky offered his opinion that, on February 27, defendant was not capable of consenting voluntarily to a search, and that defendant was

similarly incapable of giving a voluntary statement on February 27 or 28, due to drug intoxication.

■ In reviewing the voluntariness of a defendant's statements, we will not disturb the trial court's findings of historical fact if evidence supports them. *State v. Warner,* 284 Or 147, 156-57, 585 P2d 681 (1978). We are not bound by the trial court's ultimate holding as to voluntariness, however; we assess anew whether the facts suffice to meet constitutional standards. *Ibid.* The same standard of review applies to the issue of the voluntariness of defendant's consent to search. *State v. Quinn,* 290 Or 383, 394, 623 P2d 630 (1981).

■ The trial court found:

"Statements were made by the defendant which could be considered admissions or a confession. The court must be convinced by clear and convincing evidence the statements were knowing and voluntarily made.

"The defendant does not claim the officers acted improperly. He argues that he was incapable of waiving his right to remain silent.

"At hearing evidence was offered by both parties on this issue.

"The court considered evidence from witnesses who had seen the defendant during the early hours of February 27th, evidence about the work he performed that morning, testimony of an officer who saw him when he was taken into custody, testimony of the detectives who interrogated the defendant, a criminalist who tested body fluids, and a psychiatrist who had interviewed the defendant.

"Ultimately, the taped interviews became a primary focal point in the court's considerations.* * *

"Defendant was advised of his rights as required by the Miranda case several times. He indicated he understood them. I am convinced he did understand.

"* * * * *

"The court is convinced the defendant understood what was happening and that his statements would be used to prosecute criminal charges.* * *

"During the interview the defendant did not sound like he was intimidated by the officers. The court was concerned about the defendant's drug use and general and physical and

emotional condition in evaluating the evidence. This concern was overcome.

"I am satisfied he understood his rights and knew his statements would be used by the state to seek conviction. The court is also satisfied his statements were given voluntarily. He had the capacity to exercise his will had he chosen.

"Considering the totality of circumstances the court finds the defendant knew what he was doing, understood his right to refuse, and voluntarily consented to the search. The consent was obtained after the questioning of the defendant by officers on the morning of February 27. I will not repeat my observations and findings set forth above."

The trial court's findings are supported by evidence, which we have summarized above. Nothing in the record suggests that the police intimidated or coerced defendant in any way. The trial court specifically found, after examining the evidence with particular concern about the issue, that defendant's drug use did not impair his capacity to make a knowing, voluntary, and intelligent choice. We hold that the trial court did not err in concluding from its findings that defendant's consent to search and his statements were given voluntarily. *See State v. Wolfe,* 295 Or 567, 572, 669 P2d 320 (1983) (stating test for voluntariness of consent to search).

■ Defendant makes two additional arguments regarding the admissibility of his statements. First, he invites us to hold that the state must prove the voluntariness of his statements beyond a reasonable doubt. The trial court applied the "clear and convincing" standard of proof in assessing the voluntariness of defendant's admissions and his consent to search.

This court adopted the "clear and convincing" standard for the state's proof of a valid consent to search in *State v. Douglas,* 260 Or 60, 68, 488 P2d 1366 (1971). Douglas had challenged the search only under the Fourth Amendment, and this court relied only on federal case law, not including any definitive interpretation by the Supreme Court of the United States. *Id.* at 68 n 7. In *State v. Kennedy,* 290 Or 493, 502, 624 P2d 99 (1981), this court again said that the state must prove the validity of consent by clear and convincing evidence. The court cited only *State v. Douglas, supra,* and did not analyze the issue anew. *Ibid.* In *Kennedy,* however,

the court was reviewing the search under Article I, section 9, of the Oregon Constitution, as well as under the Fourth Amendment. *Id.* at 496-97. This court has expressed some dissatisfaction with the "clear and convincing" standard, *see State v. Warner, supra,* 284 Or at 160 n 3 (questioning whether the burden of proof should be changed), and we now reject it.

The Supreme Court of the United States considered the burden of proof for the voluntariness of statements in *Lego v. Twomey,* 404 US 477, 92 S Ct 619, 30 L Ed 2d 618 (1972), after this court decided *State v. Douglas, supra.* The Supreme Court held that, when a defendant challenges the state's use of a confession at trial on the ground that it is involuntary, the prosecution must prove voluntariness by a preponderance of the evidence. In *United States v. Matlock,* 415 US 164, 94 S Ct 988, 39 L Ed 2d 242 (1974), the Supreme Court applied the same standard to the voluntariness of a consent to search. Under the federal constitution, then, the state must prove the voluntariness of a consent to search, or of a defendant's statement, by a preponderance of the evidence, not by any higher burden.

More recently, the Supreme Court reaffirmed the holding of *Lego v. Twomey, supra,* in *Colorado v. Connelly,* 479 US 157, 107 S Ct 515, 93 L Ed 2d 473 (1986). There, the Court discussed its reasons for adopting and retaining the preponderance-of-evidence standard. Among those reasons is that the determination of voluntariness does not bear on the reliability of jury verdicts, but is designed only to test whether the police used coercion. The elements of the crime still must be proved beyond a reasonable doubt. The threshold question of voluntariness, which is for the court, is not relevant to the jury's decision on the substance of those elements and does not diminish the burden of proof as to guilt. 497 US at 168. We agree with that reasoning with respect to the burden of proof. Accordingly, we hold that, under Article I, sections 9 and 12, the state must prove the voluntariness of a consent to search, or of a defendant's statement, by a preponderance of the evidence.[10]

---

[10] Because the trial court held the state to a higher burden of proof than the one that we now hold was required, before finding facts in the state's favor, we need not remand for reconsideration.

■ Defendant's second argument for the exclusion of his statements is that the police must give *Miranda* warnings at "each questioning regardless of what has occurred before." Salsbery did not reiterate the *Miranda* warnings when he moved defendant from Thompson's patrol car. After his arrest, just minutes before moving from one car to the other, defendant received *Miranda* warnings. The mere transfer to another car and another officer did not necessarily require the police to advise him of his rights again.

Defendant's reliance on *State v. Mains,* 295 Or 640, 669 P2d 1112 (1983), is misplaced. In *Mains,* this court considered whether a psychiatrist who examines a defendant on behalf of the state must advise the defendant that he is entitled to have counsel present and that the results of the examination could be used against him at trial. 295 Or at 645. In that situation, the issue is whether, in the absence of warnings, the defendant may misunderstand the nature of the relationship between himself and the psychiatrist. *Id.* at 643-44. In this case, there was no such misunderstanding; defendant knew that Salsbery was a police officer.

We hold that the trial court did not err in ruling that defendant consented voluntarily to the third search of his house and that his statements to the police on February 27 and 28 were voluntary.

## ASSIGNMENT OF ERROR NO. 5

■ In his fifth assignment of error, defendant argues that the trial court erred in allowing "hearsay testimony from incompetent witnesses." Specifically, he objects to the admission at trial of testimony from Deputy House and Dr. Buchanan as to out-of-court statements of the two surviving victims. Defendant does not assert that any of the testimony failed the hearsay exceptions under which it was admitted. Rather, he contends, in summary fashion, that the introduction of the out-of-court statements violated his confrontation rights under the state and federal constitutions.[11]

The prosecutor planned to call both girls as witnesses at trial. Before trial, defendant moved for an *in camera* hearing

---

[11] Under Article I, section 11, of the Oregon Constitution, defendant has the right "to meet the witnesses face to face." Under the Sixth Amendment to the United States Constitution, defendant has the right "to be confronted with the witnesses against him."

to determine their competency, which he questioned because of their young ages.[12] The eight-year-old appeared at the hearing but became hysterical when she entered the room and saw defendant. When she left the room, her four-year-old sister saw her and began sobbing. The girls' mother testified at a later hearing that the girls remained upset and scared. The younger girl's counselor told the court that, although the child was intelligent and articulate, "the trauma of being in the same room as the defendant would supersede that" and "would re-traumatize her to a point that she would not be able to testify." The older girl's counselor made similar observations about that child's ability to testify. Other witnesses also testified about the girls.

After the pretrial hearings, the trial court ruled that the girls were not competent to testify, in that they were unable to communicate their perceptions. OEC 601.[13] The court relied on the testimony of the professionals who were working with the children, the testimony of others who had observed them, and his own observation of the eight-year-old in chambers.[14]

---

[12] By the time of trial, the older of the girls was nine, and the younger one was five. For consistency, however, we will continue to identify them as the eight-year-old and the four-year-old.

[13]OEC 601 provides:

"Except as provided in [OEC] 601 to 606, any person who, having organs of sense can perceive, and perceiving can make known the perception to others, may be a witness."

[14] Before admitting the hearsay evidence at trial, the court also ruled that the eight-year-old and the four-year-old were "unavailable" within the meaning of OEC 804(1)(d) and (e), which provide:

" 'Unavailability as a witness' includes situations in which the declarant:

"* * * * *

"(d) Is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or

"(e) Is absent from the hearing and the proponent of the declarant's state-ment has been unable to procure the declarant's attendance (or in the case of an exception under paragraph (b), (c) or (d) of subsection (3) of this section, the declarant's attendance or testimony) by process or other reasonable means."

We need not consider the correctness or the effect of that ruling, for two reasons. First, the hearsay exceptions under which the court admitted the testimony expressly apply even when the declarant is available as a witness. *See* notes 15 and 16, *infra.* Second, the concept of unavailability under the confrontation clauses is not necessarily the same as unavailability under OEC 804, Kirkpatrick, Oregon Evidence 622, § 804 (2d ed 1989). Defendant concedes, as *State v. Campbell,* 299 Or 633, 651-53, 705 P2d 694 (1985), implicitly held, that incompetence is a form of unavailability under confrontation clause analysis.

At trial, the court admitted testimony of Deputy House as to statements that the two girls had made to her on the day of the crimes. The trial court admitted the evidence under OEC 803(18a), the hearsay exception for complaints of sexual misconduct.[15] House testified only as to the girls' complaints of sexual misconduct. She was not permitted to testify about further details, such as the girls' complaints of physical abuse, one girl's complaint of bleeding, or their identification of defendant as their abuser.

Dr. Buchanan, the emergency room physician, also testified to statements made to her by the children. The trial court admitted those statements under OEC 803(4), statements made for the purpose of medical diagnosis or treatment,[16] as well as under OEC 803(18a). Buchanan testified about the children's statements regarding physical, emotional, and sexual trauma. She was not allowed, however, to testify about whether the children identified the perpetrator.

In *State v. Campbell*, 299 Or 633, 648, 705 P2d 694 (1985), this court adopted the reasoning of the Supreme Court of the United States to determine "what constitutes unavailability of a hearsay declarant and what constitutes adequate indicia of reliability of hearsay declarations to satisfy our state constitutional confrontation clause." The leading Supreme Court case in this area is *Ohio v. Roberts*, 448 US 56, 100 S Ct 2531, 65 L Ed 2d 597 (1980), where the Court established a two-part test to decide whether a defendant's Sixth Amendment confrontation rights have been satisfied when an out-of-court statement by one not testifying at trial is admitted. The Court held that the declarant must "[i]n the usual case" be unavailable, and the statement must have "adequate indicia of reliability." 448 US at 65-66. When the

---

[15] OEC 803(18a) allows hearsay evidence of an available witness to be admitted when the evidence is "[a] complaint of sexual misconduct made by the prosecuting witness after the commission of the alleged offense."

[16] OEC 803(4) provides:

"The following are not excluded by [OEC 802, the hearsay rule], even though the declarant is available as a witness:

"* * * * *

"(4) Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause of external source thereof insofar as reasonably pertinent to diagnosis or treatment."

statement falls within a "firmly rooted hearsay exception," courts will deem it to be reliable. 448 US at 66. In the alternative, reliability may be supported by "a showing of particularized guarantees of trustworthiness." *Ibid.*

Defendant asserts, without further explanation, that he "did not acquiesce in the instant finding of incompetency." We understand him to argue simply that the record does not support the trial court's finding that the two surviving girls were unable to communicate their perceptions.[17] The record does support that finding. The testimony of the children's counselors and of other witnesses who had observed them, as well as the older child's hysterical reaction to being in the same room with defendant, demonstrated that there was no reasonable prospect of their being able to give usable evidence at trial.[18]

The record also demonstrates that the second component of unavailability under the confrontation clauses was met, that is, that the state made a good-faith effort to obtain the testimony of the two girls. The state must make such an effort, although it need not perform a futile act. *State v. Campbell, supra,* 299 Or at 651-52. Here, the prosecutor planned to call both girls as witnesses. The state introduced evidence that the prosecutor and the counselors had worked with the girls to try to prepare them for the experience of going to court. The girls both came to the first pretrial hearing, which was held in chambers. The room was arranged in a nonthreatening way, with defendant seated in an alcove

---

[17] Defendant does not argue on appeal, and he did not argue below, that the trial court erred in not examining the four-year-old personally as to her ability to testify. *See State v. Campbell, supra* note 14, 299 Or at 652 ("before any out-of-court declaration of any available living witness may be offered against a defendant in a criminal trial, the witness must be produced and declared incompetent by the court"). Only the eight-year-old appeared at the hearing. The younger child also was in the courthouse, however, waiting to appear. Defendant's failure to assert below that the court was required to view the younger child personally is particularly significant, because she was readily available at a time when the court could have cured any error. *See Idaho v. Wright,* 497 US ___, 110 S Ct 3139, 111 L Ed 2d 638 (1990) ("this case does not raise the question whether, before a child's out-of-court statements are admitted, the Confrontation Clause requires the prosecution to show that a child witness is unavailable at trial and, if so, what that showing requires").

[18] Unlike *State v. Campbell, supra* note 14, the trial court in this case ruled on the question of competence on the basis of evidence.

off to the side of the room. The eight-year-old went into the hearing room; when she emerged after a few moments, hysterical, the four-year-old began to cry. In those circumstances, and in view of the extensive testimony about the children's inability to testify, the requirements of unavailability were satisfied.

 Finally, defendant argues that the children's hearsay statements do not have sufficient indicia of reliability to be admissible under the confrontation clauses. Reliability can be inferred without more, where the evidence falls within a firmly rooted hearsay exception. *State v. Campbell, supra,* 299 Or at 648 (quoting *Ohio v. Roberts, supra,* 448 US at 66). In *State v. Campbell, supra,* 299 Or at 648-50, this court held that OEC 803(18a) is a firmly rooted hearsay exception. More recently, this court also held: "The hearsay exception expressed in OEC 803(4) is 'firmly rooted.' " *State v. Moen,* 309 Or 45, 63, 786 P2d 111 (1990).[19] Defendant's confrontation rights under the Oregon and federal constitutions were, therefore, not violated.

## ASSIGNMENT OF ERROR NO. 6

 Defendant next argues that the "trial court erred in instructing the jury on the issue of drug or controlled substance dependency as a defense prior to the end of trial." He complains that

> "the trial court judge chose to pick one jury instruction which happened to deal with the crux of the defendant's case and had that read separate and apart from all the rest of the jury instructions prior to the testimony of one of the key defense witnesses. The court's emphasis on this particular instruction served to overly emphasize in the jurors' minds and to undermine the testimony of one of the key witnesses that the defense had to offer. * * * [T]here was no good and sufficient reason for the court to depart from the normal procedure for instructing the jury."

Before trial, when defendant entered his plea of not guilty, he informed the court that he intended to rely on evidence of drug use to rebut the state's evidence that he had

---

[19] In this case, as well as in *Moen,* the declarants' statements were made for the purposes of both diagnosis and treatment.

acted intentionally.[20] Counsel said that defendant intended to offer evidence of methamphetamine intoxication, but not of mental disease or defect.[21] Counsel acknowledged that, if the evidence pertained instead to mental disease or defect, then defendant would have to give notice of intent to introduce such evidence.[22] The trial court concluded that the issue had been presented prematurely and that he could not rule on it until trial. Defendant then asked for, and the trial court granted, 10 days to consider whether to give notice of intent to present evidence of mental disease or defect. Defendant did not file a notice.

At trial, defendant testified about his history of drug use and about his drug use on the night of the crimes. After he testified, and before the defense called its first expert witness, the state asked the trial court to

"limit or prevent the witness from testifying in any manner that the defendant was incapable of conforming his behavior to the requirements of the law, in that that is by statutory language the mental-disease-or-defect defense which the defense has elected not to exercise in this case."

Defense counsel reiterated that defendant was not raising a mental-disease-or-defect defense but was simply trying to

---

[20] ORS 161.125(1) provides in part:

"[E]vidence that the defendant used drugs or controlled substances, or was dependent on drugs or controlled substances, or was intoxicated may be offered by the defendant whenever it is relevant to negative [sic] an element of the crime charged."

Defendant was charged with having violated ORS 163.095(2)(d), which defines aggravated felony murder. That provision requires that the defendant have "personally and intentionally committed the homicide" under specified circumstances.

[21] ORS 161.295(1) provides:

"A person is guilty except for insanity if, as a result of mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law."

[22] ORS 161.309(1) and (3) provide in part:

"(1) No evidence may be introduced by the defendant on the issue of insanity under ORS 161.295, unless the defendant gives notice of intent to do so in the manner provided in subsection (3) of this section.

"* * * * *

"(3) * * * If the defendant fails to file notice, the defendant shall not be entitled to introduce evidence for the establishment of a defense under ORS 161.295 * * *."

refute the state's claim that he had acted intentionally. The trial court ruled that defendant could not present evidence to suggest that he was incapable of conforming his conduct to the requirements of the law.

Defendant then presented the testimony of Dr. Larson, a psychiatrist who specializes in treating drug abusers. Midway through Larson's testimony, the trial court called a recess to address objections to Larson's testimony, outside the presence of the jury. The prosecutor stated:

"My concern is, I think that up until that point the testimony has been right on the razor's edge. We have objected to any testimony that would concern the defendant's capability to form intent or otherwise, or any testimony that would deal with his ability to control himself, as being the mental-disease defense. The only testimony that would be permissible, in our opinion, is testimony specifically by this doctor as to whether he has an opinion about whether or not the defendant formed an intent to do the things he did that night. To the extent that he is going beyond that, we object."

The trial court agreed that Larson's testimony "enters very close or directly into the area that the defendant has chosen not to raise in this case." Larson had testified both about defendant's formation of intent and about the effect of methamphetamine on a user's ability to control his or her actions.

At the conclusion of the argument, the trial court announced that his "objective [was] to find a way to allow the testimony in as broad of terms as possible to be given to the jury for the single purpose of the intent issue." The court wanted to instruct the jury in such a way that they could "focus in the proper way on his testimony, but then allow him to testify perhaps in a broader way than the court would had it not given that instruction." The court decided simply to read ORS 161. 125(1). Defendant objected. The court then recalled the jury and read this instruction:

"The use of drugs or controlled substances, dependence on drugs or controlled substances, or voluntary intoxication shall not as such constitute a defense to a criminal charge. But in any prosecution for an offense, evidence that the defendant used drugs or controlled substances, or was dependent on drugs or controlled substances, or was intoxicated, may be offered by the defendant whenever it is relevant to negative an element of the crime charged."

The gist of defendant's complaint is that "there was no good and sufficient reason to depart from the normal procedure for instructing the jury" on substantive matters only at the end of the case and that he was prejudiced by the departure. Even assuming that defendant correctly describes the "normal procedure," we disagree with both his contentions.

The trial court faced a dilemma: whether to admit evidence important to the defense, which was admissible on the issue of voluntary intoxication, but not on the issue of mental disease or defect. OEC 105 provides:

> "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."

In response to the state's objection that Larson's testimony was admissible for one purpose but not another, the trial court properly gave a limiting instruction when the evidence was admitted.

Defendant characterizes the instruction, instead, as a final instruction given out of order. Even if that were so, his argument is not persuasive. Defendant concedes that a trial court has discretion to alter the customary order of events at trial, if it has good and sufficient reason to do so.[23] The limited admissibility of Larson's testimony provided a good and sufficient reason to instruct the jury at that time. The trial court acted within the permissible range of its discretion in allowing the testimony "in as broad of terms as possible," while helping the jury to focus on the relevance of the evidence.

We also fail to see how the timing of the instruction prejudiced defendant. He does not suggest specifically what harm he allegedly suffered. The instruction correctly described the relevant law and, if it emphasized anything, highlighted defendant's primary defense. The trial court did not err in giving the instruction.

---

[23] ORCP 58B, which is made applicable to criminal trials by ORS 136.330(1), provides that a trial shall proceed in the customary order, "unless the court for good and sufficient reason otherwise directs."

## ASSIGNMENT OF ERROR NO. 7

■ In his seventh assignment of error, defendant claims that the trial court erred in sentencing him as a dangerous offender, "because the state neither pled that defendant seriously endangered the life of another, nor did they ask for a jury determination of that question." Defendant is partially correct. The dangerous offender statute, ORS 161.725 (1971), provided in part:[24]

> "The maximum term of an indeterminate sentence of imprisonment for a dangerous offender is 30 years, if the court finds that because of the dangerousness of the defendant an extended period of confined correctional treatment or custody is required for the protection of the public and if it further finds, as provided in ORS 161.735, that *one or more of the following grounds exist*:
>
> "(1) *The defendant is being sentenced for a Class A felony, and the court finds that the defendant is suffering from a severe personality disorder indicating a propensity toward criminal activity.*
>
> "(2) *The defendant is being sentenced for a felony that seriously endangered the life or safety of another,* has been previously convicted of a felony not related to the instant crime as a single criminal episode, and the court finds that the defendant is suffering from a severe personality disorder indicating a propensity toward criminal activity." (Emphasis added.)

For a Class A felony, ORS 161.725(1) required only that the trial court find that the defendant was "suffering from a severe personality disorder indicating a propensity toward criminal activity." For all other felonies, ORS 161.725(2) required a finding that the "defendant [was] being sentenced for a felony that seriously endangered the life or safety of another."

In the present case, counts IV, V, VII, IX, and X are Class A felonies.[25] Count VI (sexual abuse in the first degree, ORS 163.425) was merged into Count VII for sentencing. The

---

[24] ORS 161.725 was amended, in a manner not relevant to this appeal, after the trial in this case. Or Laws 1989, ch 790, § 75.

[25] Counts IV, V, IX, and X are kidnapping in the first degree, ORS 163.235. Count VII is rape in the first degree, ORS 163.375.

trial court found that defendant suffered from a severe personality disorder indicating a propensity toward crimes that seriously endanger the life or safety of another. That finding satisfied the statutory requirements to sentence defendant as a dangerous offender on those counts.

Counts VIII and XII (assault in the second degree, ORS 163.175) are Class B felonies, and count XI (sexual abuse in the first degree, ORS 163.425) is a Class C felony. On those counts, the sentencing order states that defendant was sentenced pursuant to the dangerous offender statute.[26] Because those counts were not Class A felonies, however, ORS 161.725(2) required a finding that defendant was "being sentenced for a felony that seriously endangered the life or safety of another." The trial court made no such finding. Therefore, the state concedes, and we agree, that the reference to the dangerous offender statute in relation to counts VIII, XI, and XII should be deleted from the sentencing order.[27] On remand, the circuit court is instructed to modify the judgment accordingly.

## ASSIGNMENT OF ERROR NO. 8

Defendant contends that the trial court erred in denying his motion to limit the prosecution to one closing argument at the penalty phase. He argues that "[i]t was fundamentally unfair to allow the prosecution to open final argument and close final argument at the penalty phase."

ORCP 58B(4), made applicable to criminal trials by ORS 136.330(1), provides that "the plaintiff shall commence and conclude the argument to the jury." Defendant offers no convincing reason why the procedures in ORCP 58B(4), which he admits apply to the guilt phase of trial, should not apply equally to the penalty phase. This court has characterized the penalty phase as "merely a continuation of the same trial and not a separate or collateral proceeding threatening a new or different sanction." *State v. Montez,* 309 Or

---

[26] Defendant did not actually receive an enhanced dangerous offender sentence on those counts, but was instead sentenced only to the statutory maximums for those crimes.

[27] The state has not asked for an opportunity to have the trial court make the requisite findings on remand. Accordingly, we order that the references to the dangerous offender statute be deleted.

564, 604, 789 P2d 1352 (1990). In criminal trials, the state, as the plaintiff, has the right to present a rebuttal argument, because it bears the burden of proving its case beyond a reasonable doubt. At the penalty phase, the state also has that burden of proof.[28] The trial court did not err in permitting the prosecutor to make a rebuttal argument at the penalty phase.

## ASSIGNMENT OF ERROR NO. 9

■ Finally, defendant argues that the trial court gave instructions that unconstitutionally limited the way in which the jury could consider mitigating evidence about him. The state concedes, and we agree, that defendant is correct in the light of *State v. Wagner,* 309 Or 5, 14-20, 786 P2d 93 (1990) (*Wagner II*), which was decided after the trial in this case. Because the penalty phase of his trial was flawed, we vacate defendant's death sentence and remand the case to the circuit court for a new penalty phase proceeding or, at the election of the district attorney, for entry of a sentence of life imprisonment. *Wagner II, supra,* 309 Or at 20; *State v. Farrar,* 309 Or 132, 786 P2d 161 (1990).[29]

Convictions affirmed; sentence of death vacated; case remanded to the circuit court with instructions to delete reference to dangerous offender statute in relation to sentences on counts VIII, XI, and XII (assault in the second degree, sexual abuse in the first degree) and to conduct further proceedings on counts I, II, and III (aggravated murder) consistent with this opinion.

---

[28] ORS 163.150(1)(c) (1987), which governed the conduct of the penalty phase at the time of this trial, provided in part: "The state must prove each issue submitted beyond a reasonable doubt."

[29] Defendant reiterates several arguments concerning the death penalty that this court previously has addressed and resolved against his positions. We have considered all of defendant's remaining assignments of error and every argument made in support thereof. We find no error based on those assignments of error.