Argued and submitted September 25, 1990, affirmed February 13, reconsideration denied May 8, petition for review allowed August 6, and dismissed as improvidently granted August 14, 1991
See 312 Or 16 (1991)

# STATE OF OREGON,
*Respondent,*

*v.*

# WILLIAM RANDAL LOGAN,
*Appellant.*

## (C880085CR; CA A60572)

806 P2d 137

Diane L. Alessi, Deputy Public Defender, Salem, argued the cause for appellant. With her on the brief was Sally L. Avera, Public Defender, Salem.

Michael Livingston, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Warren, Presiding Judge, and Riggs and Edmonds, Judges.

WARREN, P. J.

Edmonds, J., dissenting.

## WARREN, P. J.

Defendant appeals his conviction for sexual abuse in the first degree. ORS 163.425. He assigns error to the trial court's decisions allowing a pediatrician, Dr. Bays, to testify about what the victim had told her and admitting a videotape of an interview between the doctor's assistant and the victim concerning the purported sexual abuse. He contends that the evidence is inadmissible hearsay and that its admission violates his right of confrontation under Article I, section 11, of the Oregon Constitution and the Sixth Amendment. We affirm.

At the time of trial, the victim was five years old. The trial court questioned her outside the presence of the jury and determined that she was competent to testify. When the jury was brought in, the child was unable to answer any questions concerning the abuse. The district attorney asked her several times if anyone had ever touched her private parts, and she responded "I don't know" and "I forgot." She said that she could not remember having seen Bays. The trial court determined that the child would not testify. Defendant chose not to cross-examine her.

The child's CSD caseworker had referred her to Bays, who testified that she had examined the child when she was four years old. When she met the child, Bays told her:

"I'm Dr. Bays, and I'm going to do a checkup to see how strong you are, how healthy you are, and if there's anything that needs to be done."

The child told her that she had been to a doctor before. Bays asked the child several questions about her medical history, including whether she had ever broken any bones, had stitches or taken any medicine.

Bays gave the child a complete physical checkup and questioned her on her "chief complaint." Bays described the examination:

"And as we do the exam I ask them questions about, you know, how are your ears, how are your eyes, have you ever had an owie here, so that when we get down to the genitalia we can ask similar questions, 'Has anybody ever touched you or hurt you down here?' "

During the physical examination, she touched the child with a

Q-tip and asked her if she had been touched there. The child told her that defendant had touched her "lower stomach, the inside of her thighs, and her vaginal area."

The state also introduced a videotape of an interview of the child by Bays' assistant, Butler, conducted immediately after Bays' examination. Butler was present when Bays met the child and talked with her about the examination. After the examination, Bays told the child:

> "Next Judy is going to talk to you because Judy is part of the people that work here with me. She needs to find out more about what happened with Bill. You told me a little bit about what happened and you showed me where Bill touched you, and she needs to find out a little bit more."

Butler interviewed the child in the same room of the hospital in which the child had first met the doctor. She told the child that she was taking notes because she needed to make a report. Butler brought out anatomically correct dolls and asked her what she called various parts of the body. When the child refused to say what she called a penis, Butler told her, "When you're at the doctor's it's ok to talk about those body parts because they're all part of our body." Butler also said, "But when you're going to talk to a doctor or to someone at the hospital, it is helpful to have the words that you call body parts." Eventually, the child used the dolls to describe the abuse.

Bays watched the interview from behind a two-way mirror. She testified that she makes a diagnosis and a prognosis for treatment on the basis of the physical examination,[1] the child's statements to her and the interview by her assistant. She characterized "sexual abuse" as a legitimate medical diagnosis. The identity of the abuser is important to her in deciding a proper course of treatment. In this case, she diagnosed chronic sexual abuse and recommended that the child receive individual therapy from a therapist trained in sexual abuse and that she be protected from defendant.

■ First, defendant contends that both Bays' testimony about the child's statements and the videotape were inadmissible hearsay. The trial court admitted the evidence under the OEC 803(4) exception for

---

[1] The physical examination revealed injury to the hymen.

"[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause of [sic] external source thereof insofar as reasonably pertinent to diagnosis or treatment."

The Supreme Court has broken the rule into three elements:

"(a)  The statement must be 'made for purposes of medical diagnosis or treatment';

"(b)  The statement must describe or relate 'medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause [or] external source thereof';

"(c)  The statement must be 'reasonably pertinent to diagnosis or treatment.' " *State v. Moen,* 309 Or 45, 55, 786 P2d 111 (1990).

The rule is based on the belief that a patient's desire for proper treatment or diagnosis will outweigh her desire to falsify and that a fact reliable enough to be a basis for a diagnosis or treatment is reliable enough to avoid exclusion as hearsay. 309 Or at 55.

■ ■  We address the doctor's testimony first. Defendant argues that the child's statements were not made for purposes of medical diagnosis or treatment, because the child was too young to understand the purposes of her answers. *See State v. Vosika,* 83 Or App 298, 731 P2d 449, *mod* 85 Or App 148, 735 P2d 1273 (1987). We cannot say as a matter of law that a four-year old child is too young to understand the nature of a medical examination. The decision must be based on the facts in each case. *See State v. Newby,* 97 Or App 598, 777 P2d 994, *rev den* 308 Or 660 (1989). Before the examination, Bays told the child that she was a doctor and was going to do a checkup to see how healthy she was and whether "there's anything that needs to be done." The child had been to a doctor before. Bays' questions about whether the child's genitalia had been touched were asked in the context of a complete physical examination. The trial court could conclude that the child's answers were motivated by a desire for medical diagnosis or treatment. *See State v. Roberts,* 97 Or App 217, 775 P2d 342 (1989).

The evidence also met the second requirement, because the child's statements to the doctor described the

"general character of the cause" of her symptoms. *See State v. Moen, supra,* 309 Or at 57. Defendant argues that the child's statements did not relate to the cause of her symptoms, because she had no symptoms and was taken to the doctor solely to confirm whether or not she had been sexually abused. We disagree. The child was taken to the doctor for a possible diagnosis of sexual abuse, because she had displayed symptoms of sexual abuse.

Finally, the statements were reasonably pertinent to diagnosis or treatment. *See State v. Moen, supra,* 309 Or at 57; *State v. Newby, supra,* 97 Or App at 602. Defendant argues that the identity of the abuser was not reasonably pertinent to diagnosis and treatment. He acknowledges that identity may be admitted when pertinent to protection of the child and the recommendation of appropriate therapy, but he argues that it was not pertinent here, because the child already had been removed from the home. *See State v. Vosika, supra,* 83 Or App at 308; *see also State v. Moen, supra,* 309 Or at 57. The child had been removed from the home temporarily. She still needed protection in the form of limiting who could visit her and establishing under what conditions she could be returned home.[2] Furthermore, the identity of the abuser was important in assessing the psychological trauma and recommending appropriate treatment.[3] *State v. Vosika, supra,* 83 Or App at 307. Bays' testimony of what the child had told her was admissible under OEC 803(4).

█    Admissibility of the videotaped interview presents a closer question under OEC 803(4). The child told Butler essentially the same thing that she had told the doctor, so the videotaped statements met the second requirement. The statements also met the third requirement, because Bays testified that she relied on the statements in forming her diagnosis and recommending treatment. It is not as clear,

---

[2] Defendant argues that CSD already had informed the mother that the child would not be returned until the mother had severed her relationship with defendant. He also argues that the doctor already knew that defendant was the abuser. The doctor may have been told before the examination that the child had said that defendant had abused her, but she was entitled to ask the child herself and to draw her own opinion about whether defendant was the culprit. Furthermore, the doctor's recommendation of protection was not superfluous simply because CSD already was protecting the child.

[3] Defendant's contention that the doctor would have recommended individual treatment anyway is pure speculation.

however, that the statements met the first requirement, *i.e.,* that the child understood that her answers to Butler's questions were for the purposes of medical diagnosis or treatment. Bays told the child that Butler needed to find out more about what had happened, but did not say why. On the other hand, Bays did tell the child that Butler worked with her, and Butler conducted the interview in the same room that the doctor had used. Most importantly, Butler told the child that it was all right to talk about a penis when "you're at the doctor's." The trial court could conclude that the child knew that the interview was part of her doctor visit and was motivated in answering the questions by a desire for medical diagnosis or treatment. *See State v. Moen, supra,* 309 Or at 57.

The dissent says that the child was not taken to Bays for medical treatment. It is not clear from what the dissent draws that inference. The child went to the doctor because of her CSD caseworker's referral. It would be sinister indeed to assume that CSD was indifferent to the child's health. In any event, the test is whether the declarant's statement was made for purposes of medical diagnosis or treatment. OEC 803(4) does not require the doctor or third parties to have a particular mental state. Although we recognize the dissent's concern with the breadth of the rule, that does not give us a license to rewrite it. The evidence was properly admitted under OEC 803(4).

■　　Next, defendant contends that his right of confrontation was violated by the admission of the videotape and the child's out of court statements. Under both the Oregon and the federal constitutions, a declarant generally must be unavailable and out of court statements must have adequate indicia of reliability. *Ohio v. Roberts,* 448 US 56, 100 S Ct 2531, 65 L Ed 2d 597 (1980); *State v. Stevens,* 311 Or 119, 140-41, 806 P2d 92 (1991). Reliability can be inferred when the statements fall within a "firmly rooted" hearsay exception. *State v. Stevens, supra,* 311 Or at 141. In *State v. Moen, supra,* 309 Or at 62, the Court held that the exception for statements for purposes of medical diagnosis or treatment is firmly rooted. Thus, the only issue is whether the child was unavailable.

In *State v. Campbell,* 299 Or 633, 705 P2d 694 (1985), the Supreme Court said that it was adopting the federal test

for determining a witness' availability under the Oregon Constitution. The court, however, never articulated that test and relied instead on the definition in OEC 804(1) for determining unavailability for hearsay purposes. 299 Or at 652. Consequently, we are not sure what relationship exists between the definition of unavailability for hearsay purposes and for constitutional purposes. *See State v. Stevens, supra,* 311 Or at 139 n 14. Nevertheless, we conclude that the child was unavailable under either test. *See State v. Montgomery,* 88 Or App 163, 166, 744 P2d 592, *rev den* 304 Or 548 (1987).

The test under the federal constitution is whether the state has made a good faith, though unsuccessful, effort to obtain the declarant's testimony at trial. *Ohio v. Roberts, supra,* 448 US at 74. The state made a good faith effort by putting the child on the stand and urging her to testify. *See State v. Stevens, supra,* 311 Or at 141.

Under OEC 804(1)(c), a declarant is unavailable if she "[t]estifies to a lack of memory of the subject matter of a statement." The rule does not require that the claim of forgetfulness be genuine, so long as the declarant takes the stand and subjects herself to cross-examination. *See* McCormick, *Evidence* 754, § 253 (3d ed 1984). The child testified that she could not remember, and defendant had the opportunity to cross-examine her on that claim. The child was unavailable, and the admission of her out of court statements did not violate the Confrontation Clauses.

Affirmed.

**EDMONDS, J.,** dissenting.

Defendant makes a point that has serious ramifications. He argues that OEC 803(4) is inapplicable because

"the child was examined by Dr. Bays primarily to find medical evidence that abuse had occurred. She was not the child's treating physician and this was not a part of any regularly scheduled visits between patient and physician."

Statements that qualify for admissibility under OEC 803(4) do so because, having been made for the purpose of obtaining medical diagnosis and treatment, they are deemed reliable and trustworthy. Statements that are procured for the purpose of producing evidence in court lack that foundation. The record in this case is absolutely clear that the child was

taken to Bays, not for medical treatment, but only for the purpose of obtaining a diagnosis that she was a sexually abused child and obtaining evidence that defendant was the one who had abused her.[1] Although Bays may have told her that she was being examined for medical purposes, purportedly to qualify her statements under OEC 803(4), I am concerned about the implications that flow from the use of the hearsay exception in this manner. I expect that we now will see many hearsay statements admitted in evidence under OEC 803(4), just because the physician, at the instance of inventive counsel, said the magic words to the declarant as a predicate for the examination.

OEC 803(4) was never intended to be a vehicle by which to manufacture evidence. *See* Louisell and Mueller, *Federal Evidence* 596, § 444 (1980). As interpreted by the majority, once the statement qualifies under OEC 803(4), it necessarily follows that defendant's right to confrontation was not violated. The result is that a defendant may be con-

---

[1] Dr. Bays is employed with the CARES (Child Abuse Response and Evaluation Services) Programs, at Emanuel Hospital, Portland. She explained why it was created:

"Well there was a meeting of the Multnomah Child Abuse Coalition, and I think it was in 1985, because there was concern that when there's a question about whether a child has been abused, that the child gets taken to many different places, and interviewed many times, and often examined many times, and there was felt to be a need for a centralized assessment center with people who were professionally trained, both in talking to children and examining children, *to help the mandated agencies, investigative agencies, help in their investigations in deciding whether a child has been abused or not.*

"So that meeting was held, and I think there were about 35 people there from the community who talked about what kind of assessment center they would like, and it was agreed that they would like an association with a hospital, and then we formed a committee that worked further on the idea, and eventually it was decided it would be Emmanuel [*sic*] Hospital." (Emphasis supplied.)

These questions and answers are from redirect examination by the state:

"Q When you see children, how do you get referrals to your clinic?

"A They come in a variety of ways. They come through *Children's Protective Services, through law enforcement,* through parents themselves, although usually we ask the parents to go back through the system which is CSD and law enforcement, through private pediatricians or private therapists.

"Q That are referred to you?

"A That are referring children to us, yes.

"* * * * *

"Q * * * Would you say that *the majority of children that you see come in through Children's Services Division or through law enforcement agencies?*

"A *That's correct.*" (Emphasis supplied.)

victed without being able to cross-examine his accuser on the basis of unsworn testimony of an out-of-court declarant procured by agents of the state whose interest was to obtain evidence, not medical diagnosis or treatment. Surely, OEC 803(4) does not permit that.