Argued and submitted May 1, 1992, affirmed on both appeals June 23, Cornett's petition for reconsideration and Huskey's petition for reconsideration denied September 29, both petitions for review allowed October 26, 1993 (318 Or 24) See later issue Oregon Reports

In the Matter of C. and K., Children.

## STATE ex rel JUVENILE DEPARTMENT OF MULTNOMAH COUNTY,
*Respondent,*

*v.*

James CORNETT
and Shannon Huskey,
*Appellants,*

*and*

Karin CORNETT,
fna Karin Huskey,
*Respondent.*

(86110; CA A70521 (Control))

In the Matter of the Marriage of

Shannon HUSKEY,
*Appellant,*

*and*

Karin HUSKEY,
nka Karin Cornett,
*Respondent.*

(D8308-66069; CA A70580)
(Cases Consolidated)

855 P2d 171

Michael A. Greenlick, Portland, argued the cause and filed the brief for appellant James Cornett.

Peter Miller, Portland, argued the cause and filed the brief for appellant Shannon Huskey.

Janie M. Burcart, Assistant Attorney General, Salem, argued the cause for respondent State of Oregon. With her on the brief were Charles S. Crookham, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Martin W. Reeves, Portland, argued the cause for respondent Karin Cornett. With him on the brief was Reeves, Kahn & Eder, Portland.

James T. Marquoit, Portland, waived oral argument for respondent children.

Before Rossman, Presiding Judge, and De Muniz and Leeson,* Judges.

ROSSMAN, P. J.

De Muniz, J., concurring in part; dissenting in part.

---

* Leeson, J., *vice* Buttler, J., retired.

**ROSSMAN, P. J.**

This is an appeal from consolidated juvenile court and domestic relations proceedings regarding two children, C and K.[1] ORS 419.561(1); ORS 19.010(4). In the juvenile proceeding, the court found both children within its jurisdiction and made them wards of the court. In the domestic relations proceeding, the court awarded mother custody of C. C's father and stepfather assign error to the admission of a videotape of a therapy session in which C identified them as the individuals who had sexually abused her. They also challenge the admission of several drawings made by C during therapy and of testimony about C's statements. We affirm both proceedings.

In 1980, father was convicted of sexually abusing his ten-year-old niece. Four years later, mother's and father's marriage was dissolved by stipulated decree. Father was given custody of their daughter, C, who is a special needs child with developmental disabilities.

In August, 1990, a Multnomah County Juvenile Court counselor filed a petition asking the court to find C within its jurisdiction because of circumstances and conditions endangering her welfare. The petition alleged that father, the custodial parent, had not sought court ordered sex offender treatment, and had recently admitted to his niece that he had sexually abused C. On August 31, CSD was awarded temporary custody of C and she was placed with mother, who was then married to stepfather.

In early September, 1990, C was examined by Dr. Keltner, a physician at the Child Abuse Response and Evaluation Services (CARES) program at Emmanuel hospital. The doctor found physical evidence consistent with sexual abuse, including erosion of the hymen down to the vaginal ridge in some areas. As a result of her findings, Dr. Keltner recommended that C be removed from any potentially abusive environment, and referred C to individual therapy with a therapist skilled in working with special needs children who have been victims of sexual abuse. The family was contacted

---

[1] In this case, we refer to the children by their initials only. On our own motion we have changed the caption of the case to delete the children's full names.

and counseling was set up at the Morrison Center, a community mental health clinic.

Mother gave birth to K in late September, 1990. On January 3, 1991, C was removed from mother's home because of concerns about mother's parenting abilities. C was placed in foster care. She was still receiving treatment at the community mental health clinic. She had been working with Carolyn Weir, a therapist at the clinic who had previous experience with developmentally disabled children. In March, 1991, C's foster mother contacted Weir and told her that C had complained of being sexually abused by both father and stepfather. Weir testified that she focused on that issue in the next few therapy sessions, in an effort to help C deal with her feelings and work through issues of blame regarding the incident. The first of those sessions was videotaped.[2]

In the next four sessions, Weir and C discussed the sexual abuse. During one session, C drew five pictures of stick figures that showed genitalia. She identified the figures as herself with father and stepfather. According to Weir, C said, "I'm sad because my dad touched me right here," and pointed to the middle of her body. She made a similar disclosure about stepfather. Weir wrote those comments onto each of the drawings.

In April, 1991, the state filed a third amended petition, alleging that both father and stepfather had sexually abused C and asking the court to find both C and K within its

---

[2] Weir testified that C had previously disclosed that she had been touched inappropriately but Weir had felt that C was too fragile to discuss it at that time. The dissent argues that the record does not support the conclusion that the touching was inappropriate. In reaching that conclusion, we relied upon the following exchange:

"Q: Do you ever broach the topic of *use* with this child in the preceding sessions you had with her?

"A: Uh-huh, yes.

"Q: And how did that work out?

"A: On one occasion I very directly asked her if she had ever been touched, and she said yes. But she was—this was very early on and she was so — so reactive to that question and I chose not to pursue it any further at that time, that I felt that our relationship really needed to develop for it to be of therapeutic worth rather than of harm to her." (Emphasis supplied.)

Unfortunately, because of the apparent error in the transcript, we cannot be absolutely certain that Weir was asked about the topic of "abuse," not "use." Given the context, however, it is an obvious and reasonable interpretation. There is no other testimony describing the circumstances surrounding this incident.

jurisdiction on the basis of that information. The proceeding was consolidated with a domestic relations court proceeding in which mother sought to obtain custody of C.

At trial, the court admitted into evidence the videotape of the therapy session and the stick figure drawings. The court found that it was more likely than not that father had repeatedly sexually abused C, and that stepfather had had inappropriate sexual contact with her.[3] As a result of those findings, the court found jurisdiction over both children, made them wards of the court, and placed them in the custody of CSD. ORS 419.476(1)(c); ORS 419.507. *See, e.g., State ex rel Juv. Dept. v. Gates*, 96 Or App 365, 774 P2d 484, *rev den* 308 Or 315 (1989). C remained in shelter care and K was placed with mother, who was ordered not to permit K to be alone with stepfather. In the domestic relations proceeding, the court modified the custody order and gave mother legal custody of C.

Father appeals the order that made C a ward of the court and the judgment that gave mother legal custody. Stepfather appeals the order that made K a ward of the court. Both assign error to the admission of the drawings, the videotape and testimony about statements that C made during therapy. They argue that the trial court should not have admitted the evidence under OEC 803(4), because C's statements were not "statements made for the purposes of medical diagnosis or treatment."

The question is whether statements[4] made by a child sex abuse victim to her treating therapist identifying her abuser are admissible under OEC 803(4), which provides:

"The following are not excluded by [OEC 802, the rule against admission of hearsay], even though the declarant is available as a witness:

"* * * * *

---

[3] The court found insufficient evidence to support the allegations regarding mother and the conditions of the residence. None of the parties appeals from those findings.

[4] Many of C's "statements" were not verbal. However, her nods and manipulations of the anatomically correct dolls were the equivalent of verbal assertions and are therefore statements. *State v. Mayfield*, 302 Or 631, 643, 733 P2d 438 (1987).

"(4) Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause [or] external source thereof in so far as reasonably pertinent to diagnosis or treatment."

In *State v. Moen*, 309 Or 45, 55, 786 P2d 111 (1990), the Supreme Court described the three requirements of OEC 803(4):

"(a) The statement must be 'made for purposes of medical diagnosis or treatment;'

"(b) The statement must describe or relate 'medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause [or] external source thereof;'

"(c) The statement must be 'reasonably pertinent to diagnosis or treatment.' "

■ As a threshold matter, father and stepfather argue that OEC 803(4) does not apply, because the person hearing the statements did not have a medical degree. They are incorrect. OEC 803(4) does not require that the declarant make her statements to a doctor. The Legislative Commentary to OEC 803(4) provides:

"This subsection *does not require that statements be made to a physician to be admissible*. Statements to hospital attendants, ambulance drivers or even members of the family or friends may be within the scope of the exception." Legislative Commentary to Rule 803(4), *reprinted in* Kirkpatrick, *Oregon Evidence* 543 (2d ed 1989.) (Emphasis supplied.)

Thus, the issue is not whether the treating therapist who heard C's statements possesses certain credentials. The issue is whether the statements meet the three requirements described in *Moen*; if so, they are admissible under OEC 803(4).

■■ The first question is whether the statements were made for the purpose of medical diagnosis or treatment. *State v. Moen, supra*, 309 Or at 57. This requirement ensures that the statements are trustworthy because the declarant is motivated by a desire to promote proper treatment or diagnosis. *See* Kirkpatrick, *Oregon Evidence* at 544. The declarant's motive in making the statements must "necessarily be

determined by reference to the circumstances in which they were made." *State v. Moen, supra*, 309 Or at 55-56.

■       In the past, we have rejected the notion that, as a matter of law, children are incapable of understanding the nature of a medical examination. *State v. Logan*, 105 Or App 556, 560, 806 P2d 137, *rev dismissed* 312 Or 16 (1991). Similarly, we cannot say that, as a matter of law, children are incapable of understanding the concept of therapy and the underlying treatment goals. In each case, we must examine the facts to determine the particular child's understanding. 105 Or App at 560.

■       In this case, the trial court found that C understood that what Weir was doing in the sessions was for C's benefit and that her cooperation would further that effort. It also found that it took "quite awhile" to develop a trust relationship with C, and that the growing therapeutic relationship between C and Weir increased C's understanding that her sadness and pain would go away by talking with Weir. Even on *de novo* review, we give some deference to the trial court's findings. *See, e.g., Moe and Moe*, 66 Or App 947, 676 P2d 336 (1984). Here, we are convinced that the record clearly shows that C had the required motive for these statements to be for the purposes of "medical diagnosis or treatment." Dr. Keltner referred C to therapy in order to treat the symptoms of sexual abuse. C attended therapy sessions at the mental health clinic every week. Weir testified that the sessions had therapeutic value. Weir also testified that after her disclosures of abuse, C no longer had an overpowering need for control, and her ability to manage her anger improved. Weir was asked about C's understanding of their sessions.

> "Q:   Does she understand the concept of treatment or therapy?
>
> "* * * * *
>
> "A:   I don't think [C] has the vaguest idea of what the word 'therapy' means, but *yes, she does understand that I am there to help her*." (Emphasis supplied.)

Weir also testified that C understood that the sessions were where she came to talk about sad things. It is clear that C knew that Weir was there to help her, and we find that, to the

best of her ability, C knew she was receiving treatment and that her statements would further that treatment.[5]

The dissent disagrees but provides no satisfactory alternative explanation of Weir's testimony that C knew that Weir was there to help her and make her "sadness" go away. Instead, the dissent argues that we have "virtually ignored" both the circumstances under which the statements were made and the first requirement of *Moen*. The thrust of the dissent's argument is that the circumstances under which C made her statements cast doubt upon whether she had the required motive in making them.

■ The dissent expresses concern over the fact that C's therapy session included playing a game.[6] Play therapy is a common and important part of treating an abused child. *See* Hall, "The Role of Psychologists as Experts in Cases Involving Allegations of Child Sexual Abuse," 23 Family L J 451, 460 (1989). It is less threatening to the child, and provides information to the treating therapist that cannot be obtained by direct interviewing. Rosenberg, "The Psychologist in Court Proceedings Involving Children," 273-76 (1979), *excerpted in Child Abuse and Neglect Litigation: A Manual for Judges* 164 (1981). Weir testified that, on one occasion, she directly asked C if she had ever been touched. C said yes. Weir was troubled by C's reaction to the question, and so she

---

[5] Weir was asked about C's understanding of the reasons for making the drawings that were admitted into evidence:

"[DEFENSE COUNSEL]: Were these statements made to you as part of the therapy or treatment that you were—

"THE WITNESS: Yes. I was working on feelings.

"[DEFENSE COUNSEL]: * * * And were you satisfied that she understood that that's why they were being—these drawings were being made?

"THE WITNESS: To the best of her ability to understand this."

[6] The dissent characterizes the statements as having been made "during a recess from a game," 121 Or App at 290, and suggests that, because C had been using her imagination during the game, her statements are suspect. We disagree with both the characterization and the suggestion. In fact, the game was played for a period of time, specified in advance. Throughout the game, C kept looking at the clock to see how much time was left to play. After the time was up, C was declared the winner, and the game was removed from the table at which C, Weir, and the foster mother sat. The removal of the game was a clear indication to C that the time for playing was over. For the next *20 minutes*, Weir worked with C on the sexual abuse issues. Finally, when C had become completely withdrawn and resistant to talking, Weir asked her if she wanted to do something else, and C reached for the game.

specifically chose to use play therapy techniques, including games, because of concerns that C would be irreparably traumatized by interrogation early in the therapeutic relationship. We do not see how the use of these recognized therapeutic tools is relevant to whether C made her statements for the purposes of "medical diagnosis or treatment."

The dissent also mentions Weir's use of positive feedback, and notes that "[i]n C's experience with Weir, she had been asked questions repeatedly and was praised when she finally gave the correct answers." 121 Or App at 290. It is not clear what importance this practice has in the dissent's argument. In any event, we reject the notion that the use of positive reinforcement when a developmentally disabled child improves her mathematics or correctly answers basic skills questions somehow casts a shadow over the veracity of her statements identifying her abusers.

Weir testified that she *routinely* videotaped sessions with *all* of her clients who had given her permission to do so. Those tapes were then viewed by a supervisory review group, which included Weir's direct supervisor at the clinic and a licensed clinical psychologist.[7] In fact, the existence of the tape was not known to the parties until a few weeks before the trial began.

■ Weir also testified that she neither made the videotape nor conducted the session for trial purposes. The dissent correctly notes that the videotape was made as part of Weir's educational process.[8] The session that was taped, however,

---

[7] The dissent notes that Weir never testified that she showed the tape of C to anyone in her supervisory review group. Weir also never testified that she did not show the tape to her group. She stated that the supervisory group routinely reviews the tapes, and that this session was taped as part of that routine. There is no evidence to suggest whether the group deviated from the routine in this case. In any event, we fail to see how C's motivation in making the statements recorded on the tape is affected by this issue.

[8] The dissent incorrectly states that Weir never revealed whether she relayed C's statements to a person licensed to make medical diagnosis or provide treatment. Weir testified:

"I — actually I had an extra consultation with [Dr. Sack] because following the disclosures I felt the need to talk to him, and so I discussed with him on, I believe, the 3rd of April."

The following exchange also took place:

was held for *therapeutic* purposes, not for education or investigation. At trial, Weir was repeatedly asked about investigatory protocols and whether she had violated them in her therapy sessions. She correctly noted that there is a distinction between a diagnostic interview conducted by a nontreating physician for the purposes of trial and a session conducted by the treating therapist for the purposes of therapy. At one point, the following exchange occurred:

"Q:   * * * Let's, in terms of foundation here, deal with any difficulties you may have encountered with [C] up to this point in time, discussing any matter.

"A:   Well, [C] has a very limited ability, in my opinion, to deal in the abstract, both expressively and receptively. So you have to be extremely concrete, in my experience, just in any level of communication with [C]. And so all of my work with her is very concrete, using lots of examples and lots of repeating of questions, repeating of things we do.

"Q:   Our Rules of Evidence here in Court allow us to use leading questions when we talk to children witnesses. Do you use leading questions when you talk to children in therapy?

"A:   Yeah. I do in cases like [C's]. The difference is I do therapy, too. I'm not doing my questioning for legal reasons. My purposes are therapeutic."

Later, Weir was questioned about several authors who had written treatises or articles on sex abuse evaluations and investigatory protocols. The following exchange occurred:

"Q:   Okay. Among the consistent protocols that you find for sex abuse evaluations — and I think you were asked a question by Mr. Gardner about leading questions.

"A:   Uh-huh.

"Q:   You're not supposed to ask leading questions.

"A:   That's very true."

---

"THE WITNESS: *When I reported this session to my supervisor*, he suggested that I make this loose verbatim report because of his past experience with cases like this and knowing that possibly things like this do come up in court.

"THE COURT: Just so I understand it, it was after the taped interview that you talked to the supervisor and the supervisor recommended this report?

"THE WITNESS: Oh, yeah. I meet with my supervisor in supervision weekly to go over all of my cases * * *." (Emphasis supplied.)

We do not agree with the dissent's reading of this passage as an admission by Weir that *she* was not supposed to ask leading questions. Instead, we read it as a response to a question about the consistent protocols for sexual abuse evaluations. In any event, we do not agree with the dissent's conclusion that C's disclosures were "elicited by inappropriate leading questions." 121 Or App at 290. The videotape shows that the disclosures about stepfather occurred as follows:

"Weir:   Your mom told me that the other day you were telling her about some things that happened to you at — with your stepdad and your real dad?

"C:   [Nods yes.]

"\* \* \* \* \*

"Weir:   \* \* \* Can you explain to me or tell me what it is your stepdad did to you?

"\* \* \* \* \*

"Weir:   I have an idea. I have some dolls over here and maybe you can show me using these dolls. \* \* \* Do you have dolls at your house? Sometimes do you play with dolls? Well, these are kind of special dolls. Have you ever seen dolls like these before?

"\* \* \* \* \*

"Weir:   Do you notice anything that is different on these dolls than what is on your dolls?

"C:   That is a girl and this is a boy. [Pointing to genitals on daddy doll.]

"Weir:   That's right. How do you know that?

"C:   [Again points to genitals on daddy doll.]

"Weir:   Is it that boy's parts?

"C:   [Nods yes.] This is a girl. [Points to mommy doll.]

"Weir:   Yeah, that's right. Have you ever seen boy's parts like these? [Pointing to genitals on daddy doll.]

"C:   [Nods yes.]

"Weir:   Where have you seen that, [C]?

"C:   At the house.

"Weir:   At whose house, honey?

"\* \* \* \* \*

"C:  [After a pause.] Grandma's house.

"Weir:  Grandma's house? Whose — whose parts did you see there? [After a pause.] Do you remember the name of the person?

"C:  [Nods no.]

"Weir:  Did you see a boy's parts or a man's parts like you see there?

"C:  [Nods yes.]

"* * * * *

"Weir:  You were telling your mom that something happened to you with your stepdad Jim.

"C:  [Nods yes.]

"Weir:  Will you show me with the dolls what happened to you with your stepdad Jim? You show me what happened with your stepdad, you and your stepdad.

"* * * * *

"Which one of these dolls looks most like you?

"C:  [Points at girl doll, using mommy doll's feet.]

"Weir:  Are you pointing at this one? [Points at girl doll.]

"C:  [Nods yes.]

"Weir:  Will you hold that doll? Will you hold this? [Foster mother hands C girl doll.] Is this the doll that looks most like your stepdad Jim? [Lifting up daddy doll.]

"C:  [Nods yes.]

"Weir:  Can you show me what happened with your stepdad Jim using the dolls? You're doing good. I know this is hard to do.

"C:  [Positions girl doll so it sits.]

"Weir:  You are sitting there. Is that what the dolls do? What does this doll [gesturing to daddy doll] do?

"C:  Standing.

"Weir:  He stands up. Okay. What does he say, and what does he do?

"* * * * *

"Weir:  Does this doll say anything to her?

"C:  [Nods no.]

"Weir:  No. Does he do something?

"C:    [Nods yes.]

"Weir:    What does he do?

"C:    [Moves the girl doll closer.]

"Weir:    They're closer, aren't they?

"C:    [Moves daddy doll's hand to touch girl doll's hand.]

"Weir:    Does he touch her? You need to show me. Why don't you hold this doll and show me what he does.

"C:    [Nodding no, pokes at daddy doll.]

"Weir:    You want me to hold this doll? Okay, but I don't know what this doll does, so you need to tell me what to do, what to move on this doll so that you can show me. Can you tell me what to move?

"C:    [Grabs daddy doll's arm.]

"Weir:    His hand?

"C:    [Nods yes.]

"Weir:    Okay. Where does he touch her with his hand?

"C:    [Points to girl doll's genitals.]

"Weir:    Will you show me? Point.

"C:    [Lifts girl doll up and points to genitals.]

"Weir:    Point where you show me he touches her.

"C:    [Points at genitals on doll. Nods yes.]

"Weir:    Do you know what this place is called?

"C:    Privates.

"Weir:    Private. It's her privates. Okay. Where does — What does he do with his hand?

"C:    Touch.

"Weir:    Touches her? And anything else?

"C:    [Inaudible.] Back up.

"Weir:    He stands her back up. Is the Jim doll standing up when he does that? What else does he do? Can you tell me what he is doing right now?

"C:    Touching her with his privates. His hand on this. [Points to genitals on girl doll.]

"Weir:    What is 'this'?

"C:    Privates.

"Weir:    Private part. Where is he touching her?

"C: Down there. [Lifts girl doll up and points to genitals.]

"Weir: And 'down there' is your private part. How often did that happen? Do you know how many...

"C: A lot.

"Weir: A lot? One time? [Holds up one finger.]

"C: [Nods no.]

"Weir: Not one time. More than one time?

"C: [Nods yes.]

"Weir: How many times do you think? Two times? [Holds up two fingers.]

"C: [Nods yes.]

"Weir: Was anybody else home when that happened?

"C: [Shaking her head no.] No.

"Weir: Do you know where your mom was?

"C: Shopping.

"Weir: Shopping. And where in the house did this happen?

"C: Brown house.

"Weir: In the brown house? Were there different rooms in the brown house?

"C: [Nods yes.]

"Weir: What room did it happen in?

"C: Mom's.

"Weir: In mom's room. And where in mom's room did it happen, [C]?

"C: The bed.

"Weir: And did he say anything to you?

"C: No.

"Weir: Nothing? Did he tell you anything was going to happen to you...[C nods no]...if you told anybody?

"C: No. [Nods no.]

"Weir: No. Did he tell you ahead of time what he was going to do...

"C: No.

"Weir:    ... to you? You've done a good job of telling me, and I know it was hard."

We are satisfied that the questions asked were sufficiently open-ended, given C's communication skills.

The dissent notes that Weir "consistently wrote in her reports that C continued to avoid sexual abuse issues and that she 'made no disclosures' " until the videotaped session. 121 Or App at 290. Weir explained these entries. Her reports had to correspond with the identified treatment goals, one of which was to improve C's ability to cope with past sexual abuse. As a result, Weir was *required* by her agency to write a sentence referring to each goal, even if it had not yet been addressed in therapy.[9]

There is no question that Weir had been given the information that C was allegedly sexually abused; C was referred to Weir for *treatment* of that abuse after Dr. Keltner found the physical signs of it. It would be ridiculous for us to require the *treating therapist* to be unaware of the psychological injury she is trying to heal. Weir testified that, despite her knowledge that C had allegedly been abused, she did not have any preconceptions about the identity of the abuser. We are satisfied that Weir's knowledge of the allegations and her techniques did not materially impact C's understanding of the sessions, or affect C's motive for making her statements.

■    Father and stepfather argue that C could not reasonably have believed that C's statements would promote effective *medical* diagnosis or treatment because Weir is not a doctor. This argument raises two issues. First, it questions Weir's credentials as the person who heard the statements. As we have already noted, the rule focuses on the motive of the declarant, not the academic accomplishments of the listener. Kirkpatrick, *Oregon Evidence* at 544. Second, it challenges the reasonableness of a declarant's belief that statements made to someone other than a doctor could promote medical treatment or diagnosis.

---

[9] Weir also testified that her statements were not intended to mean that she had interrogated C and C had denied being abused. Instead, she was simply referring to general avoidance of related issues.

Essentially, father and stepfather are asking us to hold that, as a matter of law, a therapist who is not a doctor is not engaging in "medical treatment or diagnosis," for purposes of OEC 803(4), when she provides therapy for a child referred to her for the psychological injuries associated with sexual abuse. We find no Oregon cases directly on point.

Federal courts have admitted statements of identity made by child abuse victims to mental health professionals as statements made for the purposes of "medical diagnosis and treatment" under FRE 803(4). *See, e.g., U.S. v. Newman,* 965 F2d 206 (7th Cir 1992), *cert den* 506 US ___, 113 S Ct 470 (1992); *U.S. v. Spotted War Bonnet,* 933 F2d 1471 (8th Cir 1991), *cert den* 502 US ___, 112 S Ct 1187 (1992); *U.S. v. Provost,* 875 F2d 172 (8th Cir 1989), *cert den* 493 US 859 (1989); *Morgan v. Foretich,* 846 F2d 941 (4th Cir 1988); *United States v. LeChoco,* 542 F2d 84 (DC Cir 1976). In *U.S. v. Newman, supra,* the defendant challenged the admission of a psychologist's testimony that defendant had defrauded, raped, abused, threatened and imprisoned his victim. The court noted that the rules of evidence did not apply to sentencing hearings, but said:

> "[T]he psychologist's testimony would in any event have been admissible under the hearsay exception for 'statements for purposes of medical diagnosis or treatment.' [FRE] 803(4). *Is psychology medicine? For the purpose of the rule, it is.* The idea behind the rule is that a person who believes that he is or may be ill or injured has a strong incentive to tell the professional from whom he seeks diagnosis or treatment the truth about his medical history, symptoms, etc. because if he doesn't it will be harder for the professional to diagnose his problem and treat it effectively.
>
> "* * * * *
>
> *"The rationale applies as forcefully to a clinical psychologist as to a physician, and warrants us in reading 'medical' broadly."* 965 F2d at 210. (Emphasis supplied.)

Similarly, most states that have hearsay exceptions equivalent to FRE 803(4) have held that statements made to psychologists are for the purposes of "medical treatment and diagnosis" under the rule. *See State v. Robinson,* 153 Ariz 191, 735 P2d 801 (1987); *Drumm v. Com.,* 783 SW2d 380 (Ky 1990); *Department v. Bo Peep,* 317 Md 573, 565 A2d 1015

(1989), *cert den* 494 US 1067 (1990); *In re Welfare of R.T.*, 364 NW2d 884 (Minn Ct App 1985); *State v. Bullock*, 320 NC 780, 360 SE2d 689 (1987); *In re Helms*, 77 NC App 617, 335 SE2d 917 (1985); *State v. Edward Charles L.*, 183 W Va 641, 398 SE2d 123 (1990); *Macias v. State*, 776 SW2d 255 (Tex Ct App), *rev refused* (1989).[10] In *State v. Robinson, supra*, the court admitted statements made by a child to a psychologist under Arizona's version of FRE 803(4). The court examined the rationale behind the exception and noted the importance of the identity of the abuser in the protection of the child and the treatment of ongoing psychological injuries suffered as a result of the abuse. The court found that the statements were for "medical" purposes, because the psychologist was treating the child for the "well-established" psychological problems resulting from sexual abuse. 153 Ariz at 199 n 9.

We find those cases persuasive. The rationale behind the exception focuses on the *declarant* and the trustworthiness that flows from her motive to promote proper treatment and diagnosis. Kirkpatrick, *Oregon Evidence* at 544. Father and stepfather are, in effect, asking the court to ignore the many professionals who are engaged in health care activities involving diagnosis and treatment, because they do not have medical degrees. Every day, people make statements to treating chiropractors, optometrists and psychologists about their medical history, past or present symptoms, pain or sensations, or "the inception or general character of the cause or external source thereof" in an effort to get medical help. We fail to see any relevant distinction between those statements and statements made to an orthopedist, opthamologist or psychiatrist. In each case, the person seeking help is motivated by the desire to get proper treatment for their physical and mental ailments, and in each case, if the statements meet the requirements of *Moen*, they should be admitted.

---

[10] Some states have not followed this trend. *See, e.g., People v. LaLone*, 432 Mich 103, 437 NW2d 611 (1989); *State v. Gokey*, 154 Vt 129, 574 A2d 766 (1990). In *Gokey*, the court noted that Vermont's rule did not permit the admission of statements "relating to the inception or cause of a condition," even if pertinent to diagnosis or treatment. *State v. Gokey, supra*, 154 Vt at 141 n 8. The *Lalone* court recognized the trend towards admission of statements made to mental health care providers but rejected it. The Michigan rule is narrower than the federal rule. *People v. LaLone, supra*, 432 Mich at 114.

Weir was a "Qualified Mental Health Professional" at a community mental health clinic.[11] She testified that she had to satisfy certain state requirements in order to work at the center.[12] She met weekly with her immediate supervisor, a licensed clinical social worker. Her work was supervised by a medical psychiatrist, Dr. Sack, who had the final authority to determine what treatment was appropriate.[13] At their meetings, they discussed the treatment plan and whether C was making progress. Weir described what had happened since

---

[11] OAR 309-32-135 provides definitions for the purposes of community treatment services, including the treatment of children with mental or emotional disorders, as approved by the Mental Health Division. Section 8 defines a "Qualified Mental Health Professional" as:

"(a) A licensed psychiatrist, licensed psychologist, or person with a masters degree in a mental health specialty, a registered nurse with mental health experience, *or other person approved by the community mental health program director. An 'other person' shall have at least 3 years of documented comparable education or experience in a mental health treatment setting; and*

"(b) *Who at a minimum has demonstrated competence to* identify precipitating events; gather histories of mental and physical disabilities; alcohol and drug use, past mental health services, and criminal justice contacts; *assess family, social, and work relationships; conduct a mental status assessment; document a DSM-III diagnosis or diagnostic impression; write and supervise a treatment plan; and provide individual, family, and group therapy*." (Emphasis supplied.)

Clearly, the Mental Health Division considers a "Qualified Mental Health Professional" to be competent to assess relationships and mental status, document diagnostic impressions, treat and counsel in a mental health setting.

[12] Weir's background includes four years of providing both crisis and ongoing counseling to sex abuse victims. She provided the trial court with a detailed list of jobs, volunteer work, courses and training programs that have prepared her for her position as a therapist at the Center. At the time that she provided therapy for C, she was in her final year as a graduate student at the School of Social Work at Portland State University. Her work at the center was part of a required graduate student practicum.

[13] Weir testified about the doctor's role in her cases:

"By mandate with our agency, within the first 45 days of treatment or within initial contact with the client, I need to review my treatment plan and my case summary and all the background information I have with him. He will either agree or disagree or provide suggestions. In other words, he is the consulting psychiatrist. He has final authority to sign off on whether what I am doing is appropriate treatment."

She also described the initial consultation:

"He has the child's chart in front of him. I go over the background material of the case, you know, a little bit of history. I talk about the treatment plan — this is at the initial consultation — the treatment plan that I've developed and my approach to treatment. I ask him any questions I have, he gives me any feedback he has. He questions me about different aspects of my treatment, and that's what the initial one consists of."

the last consultation, and Dr. Sack provided suggestions and guidance and approved the treatment plan. Clearly, Weir was working as a mental health care professional.

■ We now turn to the second and third requirements of *Moen*. To be admissible, statements must describe the declarant's medical history, current physical symptoms, or the general inception or cause of the symptoms. *State v. Moen, supra*, 309 Or at 55. In *State v. Logan, supra*, 105 Or App at 561, we held that a child's statements identifying her abuser met the second requirement of *Moen*, because they described the "general character of the cause" of her symptoms of sexual abuse. Here, C's statements described the people who caused the injury. They therefore meet the second requirement of *Moen*.

The statements must also be "reasonably pertinent" to diagnosis or treatment. *State v. Moen, supra*, 309 Or at 55. We have recognized that child sexual abuse involves emotional, physical and psychological injuries, and have allowed the admission of a child's statements identifying her abuser in cases where the statements were made to a doctor. *See State v. Alvarez*, 110 Or App 230, 235, 822 P2d 1207 (1991), *rev den* 314 Or 176 (1992); *State v. Vosika*, 83 Or App 298, 731 P2d 449, *clarified* 85 Or App 148, 735 P2d 1273 (1987). Identification of the abuser is necessary to protect the child from further abuse. *State v. Alvarez, supra*, 110 Or App at 235. When the abuser is a member of the family, the psychological and emotional injuries will be different than if the abuse was an isolated incident with a stranger. *See, e.g., State v. Logan, supra*, 105 Or App at 561. As a result, statements identifying the perpetrator are important to proper diagnosis and treatment of those injuries. 105 Or App at 561. For those reasons, statements of identity are "reasonably pertinent" to diagnosis or treatment. *State v. Vosika, supra*, 83 Or App at 307.

■ Here, the doctor suggested follow-up cultures, recommended that C be removed from potentially abusive situations and referred C to this therapy as part of her treatment for sexual abuse. The therapy was intended to treat the psychological injuries associated with the abuse. Father and stepfather argue that C's statements were not "reasonably pertinent to diagnosis or treatment" because a doctor did not

rely on them. They point to several cases in which we have held that statements on which a doctor had relied were "reasonably pertinent to diagnosis or treatment." *See, e.g., State v. Newby*, 97 Or App 598, 777 P2d 994, *rev den* 308 Or 660 (1989); *State v. Roberts*, 97 Or App 217, 775 P2d 342 (1989). The test, however, is not whether a doctor *has* relied on a statement, but whether the statement is *of the kind* that a doctor *would* rely on and therefore provides medically relevant information. *See United States v. Iron Shell*, 633 F2d 77 (8th Cir 1980), *cert den*, 450 US 1001 (1981). In those cases, the court did not need to determine whether the statements were "of the kind" that a doctor *would* rely on, because a doctor *had* relied on them. As the *Iron Shell* court noted:

> "Judge Weinstein * * * writes that 'a fact reliable enough to serve as the basis for a diagnosis is also reliable enough to escape hearsay proscription.' [4] Weinstein and Berger, [*Weinstein's Evidence*] at 803-129 [no edition] (1979). This principle recognizes that life and death decisions are made by physicians in reliance on such facts and as such should have sufficient trustworthiness to be admissible in a court of law. This rationale closely parallels that underlying rule 703 and suggests a similar test should apply, namely — *is this fact of a type reasonably relied upon by experts in a particular field in forming opinions*." 633 F2d at 83-84. (Emphasis supplied.)

In the past, we have held that statements identifying the abuser are "such as a physician would reasonably rely on for diagnosis or treatment." *State v. Newby, supra*, 97 Or App at 602. Here, the doctor testified that the identification of the perpetrator is an essential element in the treatment of sexual abuse. She recommended that C be removed from potentially abusive situations and that she undergo therapy for the psychological injuries of the abuse. Without knowing who the perpetrator was, the doctor's recommendations could not have been carried out in any meaningful fashion. *See, e.g., State v. Vosika, supra*, 83 Or App at 308. Identification of the abusers was important in determining which situations were potentially abusive and in effectively treating the child's psychological injuries.

■ Finally, father and stepfather suggest that the state should be required to jump an additional hurdle and prove that statements admitted under OEC 803(4) are reliable.

They are incorrect. OEC 803(4) is a "firmly rooted" hearsay exception. *State v. Moen, supra,* 309 Or at 63. When evidence falls within such an exception, reliability is inferred. *State v. Stevens,* 311 Or 119, 142, 806 P2d 92 (1991).

Having concluded that C's statements satisfy the *Moen* requirements, we hold that the videotape, testimony and drawings were admissible under OEC 803(4). *See State v. Verley,* 106 Or App 751, 809 P2d 723, *rev den* 311 Or 644 (1991).

On *de novo* review, we find by a preponderance of the evidence that father has repeatedly sexually abused C, and that stepfather has had inappropriate sexual contact with her. We therefore find, in the domestic relations proceeding, that there has been a substantial change in circumstances since the original dissolution decree, and that a change in custody is in C's best interests. ORS 107.137(1); *Southworth and Southworth,* 113 Or App 607, 612, 835 P2d 122, *rev den* 314 Or 574 (1992). In the juvenile court proceeding, the evidence that C was molested by both father and stepfather establishes that her conditions and circumstances are such that her welfare is endangered. ORS 419.476(1)(c). Additionally, the evidence that C was molested by stepfather creates similar conditions and circumstances endangering K. *See, e.g., State ex rel Juv. Dept. v. Gates, supra,* 96 Or App at 373; *see also State ex rel Juv. Dept. v. Rhoades,* 73 Or App 192, 195-96, 698 P2d 66, *rev den* 299 Or 443 (1985). It is in the children's best interest that they be made wards of the court, under protective supervision. ORS 419.507.

Affirmed on both appeals.

**De MUNIZ, J.,** concurring in part, dissenting in part.

Before hearing any other testimony, the court held a competency hearing to determine whether C would be able to testify in any helpful manner. The court and two of the lawyers asked C several questions about where she lived, who she lived with, what her phone number was, what she had for breakfast, what her dad's name was, and so forth. In response to most of the questions, she either gave no audible response or she answered, "I don't know." The court found that she was not competent to testify, because she was "unable to

communicate or to formulate communications about anything other than very proximate historical facts, what she had for breakfast, what she had for lunch."

The court admitted hearsay statements by C, in which she identified her father and her stepfather as people who had sexually abused her, and the court made C a ward of the court. The court concluded that C's half-sister, K, was also at risk of sexual abuse, because K lived in a home that included C's stepfather (K's father). The court therefore made K a ward of the court also. The only bases for making K a ward of the court were the hearsay statements made by C to Weir during therapy sessions at the Morrison Center. For the reasons expressed below, I conclude that the court erred by admitting those statements, and that it therefore erred by making K a ward of the court. However, the record contains sufficient admissible evidence that shows that C was sexually abused by someone while she was living in her father's home,[1] and I conclude that the court did not err by making her a ward of the court and awarding custody of her to her mother.

The sole issue in this case is whether statements made by a child to a graduate student, who was doing a social work practicum, but was not licensed in any way by the state,[2] are admissible under the hearsay exception for statements that are made for the purposes of medical treatment or diagnosis. OEC 803(4). As the majority recognizes, the admissibility of hearsay under that rule depends on the declarant's motive in making the statements. 121 Or App at 270. As we said in *State v. Newby*, 97 Or App 598, 777 P2d 994, *rev den* 308 Or 660 (1989),

"the declarant's motive in making the statement to the medical provider *must be* to promote treatment or diagnosis." 97 Or App at 601. (Emphasis supplied.)

That prerequisite to admissibility was not present, and the court erred by admitting C's statements to Weir.

---

[1] The admissibility of that evidence is unchallenged.

[2] Weir testified that she was a "qualified mental health professional." However, she also testified that she had not completed her degree and that she was not licensed in any way by the state.

Hearsay may be admissible under OEC 803(4) only if the declarant's purpose is to obtain medical diagnosis or treatment. *State v. Moen*, 309 Or 45, 55, 786 P2d 111 (1990). In determining whether C had that purpose when she made her statements, we must examine the circumstances under which she made them. *State v. Barkley*, 315 Or 420, 424, 846 P2d 390 (1993).

In *Barkley*, the child's statements about sexual and physical abuse were properly admitted, because the record showed that

> "the child knew (a) that the purpose of the interview [with a medical professional] was to obtain a medical diagnosis or treatment and (b) that she had to be truthful to advance that medical treatment or diagnosis." 315 Or at 426.

The record in this case does not reflect that C had a similar understanding. Yet the majority virtually ignores the circumstances under which she made her statements and the requirement that the declarant be motivated to promote treatment or diagnosis.

Weir saw C once a week at the Morrison Center. She found that C had a very limited ability "to deal in the abstract." Consequently, Weir "us[ed] lots of examples and lots of repeating of questions" when she worked with the child. She testified that she used positive feedback when C did something correctly, like adding the numbers on the dice during games.

Weir testified about C's understanding of their weekly sessions:

> "Q. [D]oes C understand what your weekly meetings, what the purpose of them is?
>
> "A. That's a very interesting question. I think that what [she] understands is that I'm the person that she comes to talk about sad things, would be how [she] would describe what she does with me probably. And she would also probably say that we play and have a good time, play games. * * *
>
> "I don't think [she] has the vaguest idea of what the word 'therapy' means, but yes, she does understand that I am there to help her."

Although Weir periodically met with a supervising psychiatrist, the psychiatrist never examined C, and Weir never told the girl that she worked with a doctor.[3]

Long before obtaining statements about sexual abuse from C, Weir assumed that the child had been sexually abused. On January 24, 1991, she wrote in a report that C continued to avoid sexual abuse issues in both talk and play. In a January 31 report, Weir indicated that there was "no change, still no disclosure." In a February 7 report, she wrote, "C avoids any exploration regarding sexual abuse." On February 14, she wrote, "C has made no disclosures."

In early March, C's foster mother told Weir that C had said that she had been sexually abused by her father and her stepfather. Weir decided to videotape her next session with the girl.[4] The videotape shows C, the foster mother and Weir playing a board game. The game involved role playing and answering hypothetical questions.[5] At one point, Weir set the board aside and used a series of leading questions and "anatomically correct" dolls to ask C about the sexual abuse

---

[3] Weir was required to meet with the psychiatrist within 45 days after her initial contact with a client to review the treatment plan that Weir had developed. The psychiatrist would either approve the plan or suggest revisions, and the two would meet once every 45 days after that to discuss the client's progress.

[4] The majority mistakenly characterizes the circumstances under which Weir made the tape. Weir testified:

"I routinely tape all of my clients for whom I have permission to tape. I am part — *as part of my educational process* at Morrison Center and Portland State I am part of a supervisory review group where we routinely review each other's — the tapes of each other's work * * *."

However, Weir never testified that she showed the tape of C to the licensed clinical social worker, to the supervising psychiatrist or to anyone else in her supervisory review group. Moreover, her testimony does not reveal whether she relayed C's statements about sexual abuse to any person who was licensed to make a medical diagnosis or to prescribe treatment. The record does not support an inference that the session was taped for "therapeutic purposes." 121 Or App at 273.

[5] The role-playing game included:

"What's the worst thing you can do to someone?"

"What's the best thing you can say about your family?"

"You've just written a book. What are you going to call the book?"

"Make up a dream."

"What do you think of a boy that sometimes plays with his penis?"

"Act like a baby."

"If you had to be changed into something else, what would you be?"

that she assumed had taken place. Weir testified that she was not supposed to use leading questions, because that would risk compromising the reliability of the child's answers.[6] In response to Weir's leading questions, C indicated that her father and her stepfather had sexually abused her.[7] Weir then asked this non-leading question, "Can you tell me again the names of the people that did this to you?" C shook her head no. Weir retrieved the board game, and the three resumed playing.[8]

---

[6] Weir explained why leading questions jeopardize the truth seeking process:

"Q. You're not supposed to use leading questions.

"A. That's very true.

"* * * * *

"Q. [W]hat is the danger in asking leading questions?

"A. Well, the danger is that you would influence the child.

"* * * * *

"Q. [D]o you know what the term 'contamination' means in a context of reporting sexual abuse?

"A. Yes.

"Q. What does that mean?

"A. It means when something has come in to interfere with the evidence?

"Q. Okay. Now, would you agree that in the therapeutic model that you're using, that there's a higher risk of contamination than in the [CARES] protocol that we've been discussing?

"A. The therapeutic model that I'm using.

"Q. Would you agree that —

"A. Yes.

"Q. Okay. Would you agree that by using leading questions there's a higher risk of contamination?

"A. Yes."

[7] As the majority's excerpts from the interview show, Weir's leading questions clearly suggested to C that her *stepdad Jim* molested her. 121 Or App at 276-78. The issue here is not whether C was molested. The issue is by whom.

[8] The majority claims that "C had previously disclosed that she had been touched inappropriately." 121 Or App at 268 n 2. That assertion reads too much into Weir's testimony. She testified:

"On one occasion [before the videotaped interview] I very directly asked her if she had ever been touched, and she said yes. But she was—this was very early on and she was so—so reactive to that question and I chose not to pursue it any further at that time * * *."

The record does not indicate what question Weir asked C in that early session, or what C's answer was. There is absolutely nothing in Weir's testimony indicating that C said anything about how she was touched, where she was touched, by whom or under what circumstances. Any assertion that she was touched *inappropriately* amounts to sheer speculation.

In their next four sessions, Weir and C discussed the sexual abuse issues that had been brought up during the March 7 session. C then drew the stick figures that are described by the majority. 121 Or App at 268.

Hearsay is ordinarily inadmissible, because it is not trustworthy. OEC 802; *Sheedy v. Stall*, 255 Or 594, 596, 468 P2d 529 (1970). However, there are exceptions to the general rule, such as the exception for statements that are made for purposes of medical treatment or diagnosis. The cornerstone of the recognized exceptions to the hearsay rule is that some statements are "made under circumstances calculated to give [them] some special trustworthiness." *State v. Kendrick*, 239 Or 512, 515, 398 P2d 471 (1965). The record establishes that the statements at issue in this case were not made under those sorts of circumstances.

In C's experience with Weir, she had been asked questions repeatedly and was praised when she finally gave the correct answers. Although Weir assumed that C had been sexually abused, Weir consistently wrote in her reports that C continued to avoid sexual abuse issues and that she "made no disclosures" before the videotaped session. During that session, she made statements about sexual abuse that were elicited by inappropriate leading questions, during a recess from a game that required her to use her imagination to make things up. Those are hardly the sort of circumstances that are "calculated to give [her statements] some special trustworthiness." *State v. Kendrick, supra*, 239 Or at 515. To the contrary, those are circumstances virtually guaranteed to generate unreliable statements.

The importance of protecting innocent children from sexual predators cannot be minimized. However, I cannot join the majority's application of OEC 803(4), which stretches the rule beyond its limits to admit statements that have nothing to do with a desire to obtain medical treatment or diagnosis. C's statements are not admissible under OEC 803(4) or any other exception to the hearsay rule.

The only bases for making K a ward of the court were the allegations that C's stepfather had sexually abused C. Apart from C's statements, the drawings and the videotape, there is no evidence identifying her stepfather as a person

who had molested her. The court erred by making K a ward of the court, and this court perpetuates that error.